724 P.2d 268 (1986)
301 Or. 447
1000 FRIENDS OF OREGON, Petitioner on Review,
v.
LAND CONSERVATION AND DEVELOPMENT COMMISSION and Curry County, Respondents on Review.
LCDC 84-ACK-027; CA A31278; SC S31859.
Supreme Court of Oregon, In Banc.[*]
Argued and Submitted November 6, 1985.
Decided August 12, 1986.
*272 Robert Liberty, Portland, argued the cause and filed briefs for petitioner on review.
Jeff Bennett, Asst. Atty. Gen., Salem, argued the cause for respondent on review LCDC. With him on the briefs were Dave Frohnmayer, Atty. Gen., and James E. Mountain, Jr., Sol. Gen., Salem.
George B. Stevenson, Curry County Counsel, Gold Beach, argued the cause and filed briefs for respondent on review Curry County.
Eleanore S. Baxendale, Portland, filed a brief amicus curiae on behalf of Metropolitan Service Dist.
LENT, Justice.
The general question is whether cities, counties, and the Land Conservation and Development Commission (LCDC) must recognize in their planning decisions that land which cannot be used for commercial farming or forestry may have other uses short of intense urban development. The specific issue is what Oregon's land use planning law requires a county to do before the county allows "urban uses"[1] of lands located outside boundaries which have been established to contain future urban growth.
We allowed review of petitioner 1000 Friends of Oregon's (1000 Friends) challenge to LCDC's acknowledgment of the comprehensive land use plan for Curry County (the county) to address that question and to clarify principles of the planning system which the legislature intended "to assure the highest possible level of liveability in Oregon," ORS 197.010, but which some Oregonians perceive as bewilderingly complex and beneficial only to a few experts and special interest groups.[2]
*273 The technical question presented is the following: having justified "exceptions" to allow uses other than the farming and forestry that Statewide Planning Goals 3 and 4 would otherwise require on certain lands, when must a county justify for those same lands "exceptions" to Goal 14, which aims "[t]o provide for an orderly and efficient transition from rural to urban land use"? The Court of Appeals held that no exception to Goal 14 was required "under the facts here," where the county took exceptions to Goals 3 and 4 "to allow the same use" which 1000 Friends claims requires exceptions to Goal 14. 1000 Friends of Oregon v. LCDC, 73 Or.App. 350, 357, 698 P.2d 1027 (1985).
We hold that the county and LCDC did not properly consider either the matters essential to determining whether exceptions to Goal 14 were required or the matters that must be considered to justify such exceptions. Therefore, we reverse that portion of the Court of Appeals' decision which held that the county's exceptions to Goals 3 and 4 sufficed to meet 1000 Friends' concern that the plan did not comply with Goal 14. Id., 73 Or.App. at 356-58, 698 P.2d 1027. We remand to LCDC to determine in which of the county's exceptions areas the plan would allow "urban uses" on "rural land," and, if there are any such exceptions areas, to determine whether the county has shown that these areas cannot practicably be put to any rural uses.
To explain our decision, in Part I we introduce the Oregon land use planning procedures and goals which frame the legal issues in this case. Part II outlines the factual background and procedural history of the Curry County controversy. In Part III we undertake to decide whether the county was required to take exceptions to Goal 14. We explain why local governments must either comply with or take exceptions to Goal 14 when they convert "rural land" to "urban uses," why the county's decision-making process failed to satisfy the requirements for justifying exceptions to Goal 14, and why this court cannot say whether the county's plan converts "rural land" to "urban uses" such that the county must either comply with or take exceptions to Goal 14. In Part IV we consider 1000 Friends' challenge to the validity of the county's exceptions to Goals 3 and 4, and in Part V we outline what must be done on remand.

I. Comprehensive Planning and Exceptions

A. LCDC, the Goals, and Plan Acknowledgment

The decision under review is LCDC's order acknowledging that the county's comprehensive land use plan and regulations comply with the Statewide Planning Goals (the goals) which LCDC has adopted under authority granted in Senate Bill 100, enacted in Oregon Laws 1973, chapter 80, and codified as amended in ORS chapter 197.
Concerned that "state intervention was needed to stop a process of cumulative public harm resulting from uncoordinated land use," the 1973 legislature enacted Senate Bill 100 in order "to substitute a systematic decisional process based on consideration of all relevant facts, affected interests and public policies." 1000 Friends of Oregon v. Wasco County Court, 299 Or. 344, 347, 703 P.2d 207 (1985); 1000 Friends v. LCDC [Goal 14 Amendment Case], 292 Or. 735, 745-46, 642 P.2d 1158 (1982); ORS 197.005 and 197.010.[3] Senate Bill 100 *274 created the Department of Land Conservation and Development (the Department), consisting of a director and professional staff, and LCDC, a seven-member citizen's commission appointed by the Governor. ORS 197.030, 197.075 to 197.090. The legislature directed the Department to prepare, and LCDC to adopt, "goals and guidelines for use by state agencies, local governments and special districts in preparing, adopting, amending and implementing * * * comprehensive plans." ORS 197.225. The legislature defined "goals" only as "the mandatory statewide planning standards adopted by [LCDC]" and did not dictate their content; the goals are general expressions of state policy, and "guidelines" are "suggested approaches designed to aid" cities, counties, state agencies, and special districts in carrying out the goals. ORS 197.015(8), (9). A goal, because it is a "statement of general applicability that implements, interprets or prescribes law or policy," ORS 183.310(8), is a "rule" within the meaning of the Administrative Procedures Act. Goal 14 Amendment Case, supra, 292 Or. at 737, n. 1, 642 P.2d 1158. In all, LCDC has adopted 19 goals, most accompanied by guidelines addressing "planning" and "implementation," along with definitions for purposes of these goals and guidelines.[4] Once the goals were adopted, each city and county (local government) in Oregon was required to make its land use decisions and to prepare comprehensive land use plans "in compliance with the goals"; once LCDC has "acknowledged" that a local government's plan and land use regulations comply with the goals, the local government must make land use decisions "in compliance with the acknowledged plan and * * * regulations." ORS 197.175(2).
By acknowledgment, then, LCDC affirms that a local government has successfully incorporated basic state policies into its planning and zoning documents and, therefore, that those documents can be used instead of the goals to evaluate most future land use decisions.[5] When a local *275 government requests LCDC to acknowledge its comprehensive plan and land use regulations (the plan), the Department's director and staff must prepare a report (the staff report) for LCDC, stating whether the plan complies with the goals. ORS 197.251(1) and (2). LCDC must give persons reasonable opportunity to submit written comments and objections to the acknowledgment request and written exceptions to the staff report. ORS 197.251(2) and (3). In deciding whether to grant acknowledgment, LCDC considers the staff report, the record made in the local government's proceedings adopting the plan, the comments, objections, and exceptions filed with LCDC itself, and, if LCDC wishes, oral argument by persons who filed these. ORS 197.251(4). LCDC then issues an order granting, denying, or continuing acknowledgment, identifying the goals with which the plan does and does not comply, and providing "a clear statement of findings" supporting its conclusions. ORS 197.251(5). Denials and continuances both indicate that there is at least one goal with which the plan does not fully comply. A denial is used when the changes required "affect many goals and are likely to take a substantial period of time to complete." ORS 197.251(13)(b). A continuance is used for more modest noncompliance and specifies actions the local government must complete "within a specified time period" to gain acknowledgment. ORS 197.251(13)(a).

B. Introduction to Goals 3, 4, and 14

The requirements of Goals 3, 4, and 14 pose the land use planning problem at the heart of this case.
Goal 3, entitled "Agricultural Lands," aims "to preserve and maintain agricultural lands," and requires in relevant part: "Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215."
Oregon's Statewide Planning Goals, n 4, supra, at 6. The pertinent part of ORS chapter 215 defines "farm use" as
"the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. `Farm use' includes the preparation and storage of the products raised on such land for human use and animal use and disposal by marketing or otherwise. `Farm use' also includes the propagation, cultivation, maintenance and harvesting of aquatic species. * * *"
ORS 215.203(2)(a). With exceptions not relevant to this case, these provisions require local governments to plan and zone areas that meet the definition of "agricultural lands" exclusively for "farm use."
Goal 4 imposes an analogous restriction on use of "Forest Lands." It aims "[t]o conserve forest lands for forest uses," and provides in part:
"Forest land shall be retained for the production of wood fibre and other forest uses. Lands suitable for forest uses shall be inventoried and designated as forest lands. * * *"
Planning Goals at 6. The goal goes on to define "forest uses" as follows:

*276 "Forest usesare (1) the production of trees and the processing of forest products; (2) open space, buffers from noise, and visual separation of conflicting uses; (3) watershed protection and wildlife and fisheries habitat; (4) soil protection from wind and water; (5) maintenance of clean air and water; (6) outdoor recreational activities and related support services and wilderness values compatible with these uses; and (7) grazing land for livestock."
Id.
Unlike Goals 3 and 4, referred to as "resource goals" because they restrict the uses of lands rich in certain resources to uses appropriate to their natural endowments,[6] Goal 14 aims not to protect particular natural resources but "[t]o provide for an orderly and efficient transition from rural to urban land use." (Emphasis added.) Planning Goals at 13. While the parties dispute precisely what Goal 14 requires and permits, it is clear that the goal obligates local governments to establish as part of their comprehensive plans urban growth boundaries (UGBs) which "identify and separate urbanizable land from rural land."[7] (Emphasis added.) Id. "Establishment and change of the boundaries" is to be based upon consideration of seven factors (the establishment factors):
"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;
"(2) Need for housing, employment opportunities, and livability;
"(3) Orderly and economic provision for public facilities and services;
"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;
"(5) Environmental, energy, economic and social consequences;
"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and
"(7) Compatibility of the proposed urban uses with nearby agricultural activities." (Emphasis added.)
Id. The goal further provides that once included within the UGB, land "shall be considered available over time for "urban uses." (Emphasis added.) Id. Finally, "[c]onversion[8] of urbanizable land to urban uses shall be based on consideration" (emphasis added) of four additional factors (the conversion factors):
"(1) Orderly, economic provision for public facilities and services;
"(2) Availability of sufficient land for the various uses to insure choices in the market place;
"(3) LCDC goals; and,
"(4) Encouragement of development within urban areas before conversion of urbanizable areas."
Id.
In general, Goal 14 provides that "urban uses" should occur on "urbanizable land" which has been included within a UGB by applying the establishment factors, and then justified for "urban uses" by applying the conversion factors. The definitions accompanying the goals define the three types of land referred to in Goal 14 as follows:
Urban land
"Urban areas are those places which must have an incorporated city. Such areas may include lands adjacent to and outside the incorporated city and may also:

*277 "(a) Have concentrations of persons who generally reside and work in the area
"(b) Have supporting public facilities and services."
Urbanizable land
"Urbanizable lands are those lands within the urban growth boundary and which are identified and
"(a) Determined to be necessary and suitable for future urban uses

"(b) Can be served by urban services and facilities
"(c) Are needed for the expansion of an urban area."
Rural land
"Rural lands are those which are outside the urban growth boundary and are:
"(a) Non-urban agricultural, forest or open space lands or,
"(b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use." (Emphasis added.)
Planning Goals at 24. However, there is no definition of "urban uses."
In a nutshell, the reason the requirements of these goals posed a land use planning problem is that Curry County wanted to allow admittedly non-farm uses of indisputably "agricultural lands," admittedly non-forest uses of indisputably "forest lands" and, so 1000 Friends contends, "urban uses" of lands that are not within any UGB.

C. The Exceptions Process

In order to allow land use which any goal would prohibit, a local government must take an "exception" to that goal. 1000 Friends of Oregon v. Wasco County Court, supra, 299 Or. at 352, 703 P.2d 207. An "exception" is "essentially a variance," a comprehensive plan provision which allows a local government to waive compliance with a goal for "specific properties or situations." Id.; ORS 197.732(8).
The exceptions process was originally controlled by Goal 2, Part II. Under proper circumstances, local governments could use this provision to override the requirements of other goals. "When * * * it [was] not possible to apply the appropriate goal to specific properties or situations," (emphasis added), Goal 2 required a local government to indicate each proposed exception to each goal during its plan preparation and in its public notices and to explain "the compelling reasons" for the use proposed by each adopted exception, including the need to provide for that use in that place rather than others, the long-term effects of that use, and the compatibility with uses of nearby lands.[9] In a policy memorandum, LCDC stated that the process "is normally limited to" the resource goals, including Goals 3 and 4 but not Goal 14.[10]
In 1979 LCDC stated that "an exception is not required for Goals 3 and 4 if findings can be made that the land is (a) physically developed or built upon or (b) irrevocably committed to nonfarm or nonforest uses *278 * * *."[11] In July, 1982, LCDC confirmed that policy in a new rule, OAR 660-04-025(1), providing that "[i]f a conclusion that land is built upon or irrevocably committed is supported, the four factors in Goal 2 need not be addressed." (Emphasis added. See n. 9, supra, for "the four factors in Goal 2.")
On August 10, 1983, the Court of Appeals held that LCDC's "built" and "irrevocably committed" exceptions mechanism was unlawful because "it excuses local governments from the consideration of factors made mandatory by Goal 2." Marion County v. Federation for Sound Planning, 64 Or.App. 226, 235, 668 P.2d 406 (1983). The court held that the policy was so contrary to the provisions of Goal 2 that LCDC could promulgate it only by amending that goal; LCDC had not done that. 64 Or.App. at 235, 668 P.2d 406.
On August 9, 1983, the day before that decision, however, the legislature enacted ORS 197.732, which expressly authorized local governments to adopt "physically developed" ("built") and "irrevocably committed" exceptions as well as "reasons" exceptions, i.e., the type Goal 2 had always expressly allowed. On December 30, 1983, LCDC amended Goal 2 to conform to the new statute. Planning Goals at 2.[12]
The parties generally agree how the exceptions process should now work. First, a local government takes inventory of the resources, the existing uses, and the potential uses of its lands to determine which goals apply. For example, it may find that an area consists of agricultural land as defined in Goal 3 but does not contain any forest land as defined in Goal 4; the exclusive farm use requirement of Goal 3, but not the forest use requirement of Goal 4, applies to that land. Second, the local government identifies the uses that conflict with requirements of the goals. For example, the county may wish to establish non-farm residences on agricultural lands, a use which generally conflicts with Goal 3. Third, for each conflict it identifies, the local government decides whether to plan and zone land consistently with the goal's requirements, or to seek an exception.
A local government which decides to take an exception must use the procedures and the substantive standards provided in ORS 197.732, as interpreted by LCDC's amended Goal 2 and administrative rules in OAR chapter 660. It must give public notice of proposed exceptions summarizing issues to be discussed, hold a public hearing on those issues, state its findings of fact and reasons for deciding that the substantive standards for each exception have or have not been satisfied, and develop a record suitable for LCDC's review of the decision. ORS 197.732(4) to (6); Goal 2, Part II; OAR 660-04-000(2) and (4); OAR 660-04-030 and 660-04-035.
*279 Although ORS 197.732 codified the categories of exceptions which LCDC applied in practice until Marion County v. Federation for Sound Planning, supra, the present scheme differs from the old one in two ways. First, LCDC has provided for the taking of exceptions to Goal 14. OAR 660-04-010(1)(c), 660-14-000 to XXX-XX-XXX. Second, exceptions are not limited to cases where it is "not possible" to apply a goal; each of the three possible types of exceptions requires a different kind of analysis, defined by ORS 197.732(1) and elaborated in OAR chapter 660.
The first type, a "built" exception, may be taken to allow an existing use when "[t]he land subject to the exception is physically developed to the extent that it is no longer available for uses allowed by the applicable goal." (Emphasis added.) ORS 197.732(1)(a); OAR 660-04-025(1). The local government must set forth "[t]he exact nature and extent of the areas found to be physically developed." OAR 660-04-025(2). Uses allowed by the applicable goals to which an exception is being taken may not be used to justify an exception for "physically developed" land. Id.
The second type of exception, for land not yet developed but "irrevocably committed as described by commission rule to uses not allowed by the applicable goal" (emphasis added), may be taken if "existing adjacent uses and other factors make uses allowed by the applicable goal impracticable." (Emphasis added.) ORS 197.732(1)(b). LCDC describes "irrevocably committed" in two different rules, one that applies generally and another for a narrower but ill-defined class of land use decisions.[13]
If land is neither "developed" nor "committed," a local government which believes that land is needed for development may seek an exception under the standards of ORS 197.732(1)(c). These correspond to the factors under the original version of Goal 2, Part II. LCDC is required to adopt rules establishing the circumstances in which particular "reasons" may justify an exception to a goal. (Emphasis added.) ORS 197.732(1)(c)(A) and (3). LCDC has adopted "reasons" rules for specific goals and land use decisions, OAR 660-04-022(2) to (9) and 660-14-040, as well as a residual rule for other "uses not specifically provided for." OAR 660-04-022(1). To justify a "reasons" exception, a local government must also show that areas which would not require an exception cannot reasonably accommodate the use, that long-term effects will not be significantly worse than if the exceptions area were located elsewhere, and that the proposed use can be made compatible with adjacent uses. ORS 197.732(1)(c)(B) to (D).
Whatever the type of exception, the local government must make findings of fact and a statement of reasons why the standards for an exception have or have not been met. ORS 197.732(4). In reviewing decisions on exceptions, LCDC, bound by any local government factual findings for which the record contains substantial evidence, must determine whether and state reasons why the standards for exceptions have or have not been met. ORS 197.732(6).

II. The Curry County Controversy

A. The Setting

The parties do not dispute the facts concerning the natural characteristics and historic uses of the county's land, which appear in the record in the comprehensive plan. Curry County, the southernmost county on Oregon's coast, lies within the Klamath Mountains physiographic region and consists of mountain ridges, narrow river canyons, terraces produced by ocean waves and river flooding, lowland floodplains, marshes, and dunes along the coast. Most of the county is forested, primarily with Douglas Fir; its rivers are renowned for scenic beauty and sport fishing; its wildlife includes sizable populations of deer, bear, other big game, upland game *280 birds, wintering waterfowl, and small furbearers. The first inhabitants, Qua-to-mas, Chetcos, and tribes speaking other dialects of a common Athapascan language, set up villages near river and stream mouths and developed a culture highly dependent on ocean resources. White settlement, also based largely upon the area's natural endowment, began in the early 1850s with efforts to establish sawmills, gold mining, and trade routes to more inland settlements. Further development established small towns, ferries, lumber mills, and mining of gold, borax, nickel and sandstone. Cultivation of ornamental lily bulbs, a crop of which the county is now a leading producer, began in the 1940s.
When the county submitted its comprehensive plan for LCDC acknowledgment in 1982, 98 percent of its land was still in uses closely tied to natural resources: 90 percent for forestry, 7 percent for grazing and rangeland, and 1 percent for crops. The remaining 2 percent contained all residential, commercial, industrial, and other non-resource uses, as well as the county's rivers and estuaries. The non-resource uses are concentrated in the vicinities of the three incorporated cities (Port Orford, Gold Beach and Brookings), in what the plan denominates as "Rural Communities" (Langlois, Ophir, Nesika Beach and Agness), and along the Rogue, Chetco and Pistol Rivers. All these areas except Agness, located inland where the Illinois and Rogue Rivers join, are located along or near U.S. Highway No. 101, the major highway in the county.
The areas at issue in this case occupy a tiny fraction of the county's 1,064,960 acres (1,664 square miles) but contain a substantial part of the land not owned by government or timber companies. The Siskiyou National Forest, the Kalmiopsis and Wild Rogue Wilderness areas, and other federally owned lands comprise 65 percent of the county. Another 28 percent is owned by timber corporations and another 1 percent by the state. Still another 1 percent lies within the planning jurisdiction of the three cities, all of whose comprehensive plans and UGBs LCDC has acknowledged. The remaining 5 percent contains 54,000 acres (about 84 square miles) outside the UGBs. The county has chosen to take exceptions to Goals 3 and 4, to allow non-resource uses, in areas totaling 10,400 acres (about 16 square miles). 1000 Friends charges that 4,000 acres[14] of those exceptions were taken in violation of Goals 2 and/or 14.[15]

B. The Plan and the Objections, 1982

The county's plan for lands outside the UGBs, submitted for LCDC acknowledgment in April 1982, included a Committed Lands Document containing both the county's criteria for taking exceptions and its 79 specific exceptions areas totaling the 10,400 acres.
The exceptions criteria included size of parcels, size and development of neighboring parcels, residential density and percentage of land covered by residential uses, proximity to UGBs or established rural communities, "other features which preclude * * * resource use," and availability of public services.
In applying the criteria to specific areas, the county included maps and data sheets indicating the total acreage, number of parcels, size of parcels and number of "developed" parcels. The data sheets concluded with paragraphs on Committed Area's Land Use, Adjacent Land Uses, Topography and Natural Features, Transportation and Public Facilities, and Evaluation Comments. For the four largest exceptions areas, the "Rural Communities," the materials also included a General Description and accounts of Community Features and *281 Community Boundaries. Four "Undeveloped Subdivisions" and 71 other areas of "Developed and Committed Residential Lands" lie primarily near the coast and on the lower Rogue, Chetco, Pistol, Elk, and Winchuck rivers. Neither the data sheet format nor the documents for the specific exceptions areas indicated which resource goals were applicable to the lands, to which goals exceptions were being taken, or how the county proposed to zone the lands.[16]
1000 Friends objected to all or part of 66 exceptions areas, on several grounds. First, it charged that in general the criteria violated Goal 2, Part II, because they "overemphasized the significance of parcelization" without properly weighing the other factors prescribed by LCDC's rule on "committed" exceptions, i.e., common ownership of parcels, actual uses, neighborhood characteristics, adjacent uses, and natural boundaries.
Second, it argued that individual exceptions areas violated Goal 2 because the data sheets supporting them omitted information needed to determine whether lands were "committed" to non-farm or non-forest use under the proper legal standards. It objected especially to including large parcels of vacant land with built-up parcels in the exceptions areas.
Third, cross-referring to the county's zoning maps, 1000 Friends claimed that the actual zoning of the exceptions area lands violated Goal 14 by allowing urban-like development in rural areas. "The county has not made any effort to segregate urban uses, residential densities and services and locate them inside the urban growth areas [but instead] * * * ratified the wasteful, haphazard pattern of development which existed prior to Senate Bill 100." 1000 Friends noted that the exceptions areas contained more land than all three of the county's cities and their urban growth areas combined; that the 2.4 persons/acre population density in the most intensely developed rural residential zone (one-acre minimum lot size) would be higher than the 1.5 persons/acre in the county's cities (which have lower densities than exist in such other Oregon coastal cities as Florence (2.1), Lincoln City (3.3), and Cannon Beach (9.3)); and that according to the county's own estimates of population growth and new housing, the percentage of the county's people living in cities and urban growth areas would actually decline under the county's plan, from 54 percent in 1980 to 45 percent in 2000. (With its brief in the Court of Appeals, the county eventually submitted revised estimates in which the percentage would remain constant.)
1000 Friends also complained that the plan, without explaining the need for industrial and commercial uses outside the UGBs, zoned over 1,000 acres of rural lands for those uses, substantially more land than is so zoned within Brookings, the county's largest city in both area and population. The county eventually replied that the rural industrial land consists entirely of present or former (presently vacant) industrial sites, and only 140 of the commercial acres would be new development.

C. LCDC's Decisions, 1982-84

On December 14, 1982, LCDC entered a Continuance Order, concluding that the county's plan complied with Goals 1, 6 to 8, and 13, but not with Goals 2 to 5, 9, 12, and 16 to 18, for reasons given in an October 29, 1982 staff report. The report stated that the county's "committed" exceptions criteria were consistent with those in LCDC's "committed" exceptions rule and that all of the specific exceptions areas, except for the Rural Communities and three of the Undeveloped Subdivisions, were in compliance with Goal 2. In effect, the report denied that Goal 14 applied at all to the county's plan. The report said simply that "[t]he county's acknowledgment request is for the area outside of the acknowledged *282 urban growth boundaries." Because the statute then in effect, former ORS 197.251(8)(a)(C) (repealed by Or.Laws 1983, ch. 827, § 5), had been interpreted to make continuance orders "final" only as to the goals with which the entire plan was expressly found "in compliance," 1000 Friends could not at that time obtain judicial review of its unsuccessful Goal 2 and Goal 14 objections.[17]See 1000 Friends of Oregon v. LCDC [Benton County ], 56 Or. App. 759, 761-62, 643 P.2d 654 (1982); 1000 Friends of Oregon v. Marion Co., 56 Or. App. 755, 758, 643 P.2d 652 (1982).
The Continuance Order gave the county 150 days to revise its plan, which was resubmitted to LCDC in August 1983. The county had not changed either its "committed" exceptions criteria or the specific exceptions areas. 1000 Friends iterated its 1982 objections to both, based on its earlier arguments and on photographs newly added to the record purporting to show that some lands the county said could not be farmed were still being used for commercial lily bulb farming.
On January 30, 1984, the county adopted amendments to the portions of its Committed Lands Document covering the Rural Communities and the Undeveloped Subdivisions which LCDC had not acknowledged in 1982. The Rural Communities portions emphasized that the boundary for each community was "in the appropriate location" and that the lands were either developed or "committed to non-resource use" such that it was "impracticable to apply Goals 3 and 4." The Undeveloped Subdivisions portions emphasized that most parcels had been sold into individual ownerships, Public facilities had been developed, and many new homes had been built. No part of the amended Committed Lands Document stated whether any lands were built or committed to "urban uses" or mentioned Goal 14 in any manner.
Following a February 3 hearing, on February 17, 1984, LCDC issued an acknowledgment order finding the county's plan in compliance with Goals 1 to 13. LCDC based its decision on a January 20, 1984, staff report, revised on February 1 to take into account the county's January 30 amendments. The report concluded that the amendments demonstrated irrevocable commitment of the lands to non-resource uses and that the entire plan complied with Goal 2. The report said that the county's compliance with Goals 16 to 18 would be reviewed separately; however, although 1000 Friends continued to claim that the urban levels of development on rural land violated Goal 14, neither the staff report nor the acknowledgment order said anything about that goal and its application to the exceptions areas.

D. The Court of Appeals Decision, 1985

On 1000 Friends' appeal, the Court of Appeals rejected the Goal 2 objections without reaching their merits. The court said that the exceptions criteria in the county's plan had no legal effect, because any post-acknowledgment exceptions would be treated as plan amendments and reviewed for compliance with the goals rather than with the plan. 73 Or.App. at 352, 698 P.2d 1027, citing ORS 197.732(6)(b), (8), and ORS 197.835(4). Therefore, it made no difference whether the criteria complied with the goals. Id. The court also declined to review the individual exceptions areas because it believed that 1000 Friends, except for one area discussed "by way of example," had not sufficiently specified the objections to particular areas. Id. at 352-53, 698 P.2d 1027. Thus, the court did not expressly affirm that the challenged areas were justifiably excepted from the resource use requirements of Goals 3 and 4.
Nevertheless, the court appeared to assume the validity of those exceptions in rejecting 1000 Friends' Goal 14 objection. *283 See 73 Or.App. at 356, 698 P.2d 1027 ("The validity of those exceptions is not in issue here."). 1000 Friends argued that even if the exceptions to Goals 3 and 4 were valid, allowing non-resource uses in the 79 areas, the "new urban types of uses" proposed for these areas outside the UGB would violate Goal 14 and therefore required exceptions to Goal 14 as well. The Court of Appeals said there was no precedent for requiring a local government that had taken exceptions to Goals 3 and 4 "to permit the nonresource use of land" to also take an exception to Goal 14 "to allow the same use." 73 Or.App. at 357, 698 P.2d 1027. The court reasoned that because "the issue here does not involve the inclusion of resource land in a UGB" and "Goals 3 and 4 specifically regulate the use" of the land in the exceptions areas, "[t]here is no legal or logical reason why the county should be required to supplement its exceptions to these goals with an exception to Goal 14." Id. at 358, 698 P.2d 1027.[18] The court thus affirmed LCDC's disposition of the Goal 14 issue and remanded to LCDC for reconsideration only of matters concerning another assignment of error that is not before us. Id. at 356-358, 698 P.2d 1027.
1000 Friends petitioned for our review of both the Goal 2 and the Goal 14 issues. In this court, all parties and amicus curiae Metropolitan Service District (Metro) have focused on whether the county should have taken exceptions to Goal 14.
Because the county's acknowledgment order is "a commission order," ORS 197.251(5), judicial review is "in the manner," and subject to the scope of court authority, provided in ORS 183.482. ORS 197.650(1). ORS 183.482(8) provides:
"(a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:
"(A) Set aside or modify the order; or
"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.
"(b) The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:
"(A) Outside the range of discretion delegated to the agency by law;
"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or
"(C) Otherwise in violation of a constitutional or statutory provision.
"(c) The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."
We are particularly concerned with whether LCDC "erroneously interpreted" Goal 14 when it responded to 1000 Friends' Goal 14 objection only by indicating that Goal 14 was inapplicable to decisions concerning areas outside the UGBs and, if so, whether "a correct interpretation compels a particular action" by LCDC. ORS 183.482(8)(a). We also examine the validity of the exceptions to Goals 3 and 4 and consider LCDC's argument that those exceptions were sufficient to meet the standards for exceptions to Goal 14. We therefore inquire whether the county has "set forth findings of fact and a statement of reasons" and whether LCDC has "adopt[ed] a *284 clear statement of reasons which sets forth the basis for the determination" that "the standards of [ORS 197.732(1)] have * * * been met" for exceptions to every applicable goal in the situations where exceptions were required. ORS 197.732(4), (6)(c). See also ORS 197.251(5)(b) (requiring that LCDC's acknowledgment order include "a clear statement of findings in support of the determinations of compliance" with the goals).

III. Were Exceptions to Goal 14 Required?

To determine whether the county must take exceptions to Goal 14 covering areas for which it has already taken exceptions to Goals 3 and 4, we must consider three subsidiary questions:
A. Must a county take an exception to Goal 14 when converting "rural land" outside an urban growth boundary to "urban uses"?
B. Does the taking of exceptions to Goal 14 require consideration of matters which the county did not consider in taking its exceptions to Goals 3 and 4?
C. Does the county's plan, in the areas for which it took exceptions to Goals 3 and 4, in fact convert "rural land" outside the urban growth boundaries to "urban uses"?
Only if the answer to all three questions is "yes" was the county required to take exceptions to Goal 14.
The meanings of the defined term "rural land" and the undefined term "urban uses," see Part I.B, supra, 301 Or. at 455-457, 724 P.2d 276-277, are critical to our inquiry. The first two of the foregoing three questions concern the legal consequences that follow from the determination that a plan allows "urban uses" on "rural land": the requirement of exceptions to Goal 14 and the standards that must be met to justify such exceptions. These questions we can resolve as a matter of law without considering problems of defining "urban uses." We may first assume with the parties that this term can be given some determinate meaning, then examine what the language and policy of Goal 14 indicate should be done concerning "urban uses"whatever these may bewhen they occur on "rural land" outside UGBs. In considering the first two questions, we employ "urban uses" in the same sense as do the parties in their pertinent discussion, to stand for the as-yet-unspecified uses that the relevant statutes, goal and administrative rules require to be treated in certain ways when they are located on "rural land."
To answer the third question, however, requires discussion of what "urban uses" really are, to determine whether this county's plan in fact allows them on "rural land." Because the land use statutes gave to LCDC, rather than to this court, the "authority to fill in the so-called `interstices' of the statutes" by adopting goals and reviewing plans for compliance with those goals, see Springfield Education Assn. v. School Dist., 290 Or. 217, 221, 621 P.2d 547 (1980), our discussion necessarily gives "some deference" to LCDC's own interpretation of the term "urban uses" as used in Goal 14, which LCDC itself adopted. Branscomb v. LCDC, 297 Or. 142, 145, 681 P.2d 124 (1984). To the extent that the meaning of "urban uses" is ambiguous in the light of the goals and other definitions, we would review any interpretations by LCDC of that term in this case only to determine if they "express a new policy or standard varying in substance from the existing policy and standards of Goal 14," 1000 Friends of Oregon v. Wasco County Court, supra, 299 Or. at 369, 703 P.2d 207; ORS 183.482(8)(b)(B) (court shall remand agency order if exercise of discretion is "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained"); if they are "within the legislative policy which inheres" in the statutes that give LCDC the authority to adopt the goals (ORS 197.225 and 197.230), see Springfield Education Assn. v. School Dist., supra, 290 Or. at 227, 621 P.2d 547; ORS 183.482(8)(a) (a court may set aside, modify or remand if agency has "erroneously interpreted a provision of law"); and *285 if the factual findings on which they rely are "supported by substantial evidence in the record." ORS 183.482(8)(c). However, LCDC's acknowledgment order and staff reports in this case offer no interpretation of "urban uses." We employ that term in our discussion of the third question only in an effort to discover from other sources whether LCDC has made a definitive interpretation that can tell us whether this county's plan allows "urban uses."
A. Goal 14 and Conversion of Rural Land to Urban Uses
We read the responses of LCDC's staff reports and acknowledgment order to 1000 Friends' Goal 14 objectionsin 1982 merely noting that the acknowledgment request was for the area outside the acknowledged UGBs, and in 1984 omitting mention of Goal 14to express the legal position that Goal 14 does not pertain in any way to decisions which affect land outside UGBs and do not establish or change a UGB. The Court of Appeals took the position that "under some circumstances, a local government may be required to take an exception to Goal 14 to allow an urban use on rural land." 73 Or.App. at 357, 698 P.2d 1027. We hold that any county whose comprehensive plan converts "rural land" outside of established urban growth boundaries to "urban uses" must either (1) show that its action complies with Goal 14, or (2) take an exception to Goal 14, as prescribed by ORS 197.732, Goal 2, Part II, and OAR chapter 660.
1000 Friends and LCDC's lawyer (differing from the position LCDC took in its acknowledgment order and staff report) maintain that the reasoning of 1000 Friends of Oregon v. Wasco County Court, supra, does not necessarily require this holding but that of Perkins v. City of Rajneeshpuram, 300 Or. 1, 706 P.2d 949 (1985), does. We agree.
In Wasco County Court we noted decisions in which LCDC and the Land Use Board of Appeals (LUBA) have held that Goal 14 "prohibit[s] urbanization outside existing UGBs," but did not need to decide whether these were correct. 299 Or. at 367 n. 22, 703 P.2d 207. We held that a county need not take an exception to Goal 14 when it approves a petition to incorporate a city on land outside of existing UGBs. Id. at 370, 703 P.2d 207. Although that opinion contains language from which the county has argued here that Goal 14 has nothing to do with a decision which neither establishes nor changes a UGB, see id. at 363, 703 P.2d 207 ("On its face, Goal 14 provides a process for the establishment and change of UGBs, and nothing more."), we cannot reconcile the county's argument with the reasoning and holding of Wasco County Court. After stating that "Goal 14 specifies the requirements for conversion of rural land to urban land," id. at 351, 703 P.2d 207 (emphasis added), we noted that incorporation alone would not authorize changes in the classification or use of the land; conversion from rural to urban land could result only later, after the establishment of a UGB. Id. at 365-66, 703 P.2d 207. Because a local government must take an exception only "where an applicable goal would otherwise prohibit [a local government's] proposed action," id. at 352, 703 P.2d 207, and "even assuming * * * that Goal 14 prohibits urbanization outside UGBs, it does not follow that an action which cannot result in urbanization before a UGB is established is also prohibited," id. at 367 n. 22, 703 P.2d 207, we required no exception to Goal 14. Nevertheless, because it is likely that after incorporation a city will propose a UGB, we said that even at the incorporation stage a county may not simply ignore Goal 14; it must, as with the other goals, determine that "it is reasonably likely that the newly incorporated city can and will comply with the goals once the city assumes primary responsibility for comprehensive planning in the area to be incorporated." Id. at 360, 367-68, 703 P.2d 207. We did not identify which decisions concerning lands outside urban growth boundaries require the taking of exceptions to Goal 14.
In Perkins v. City of Rajneeshpuram, supra, it was undisputed that the city's challenged action would convert rural *286 agricultural land to "urban uses," 300 Or. at 4, 706 P.2d 949, and we held that "the city was required to comply with Goal 14 either by (1) meeting its requirements, or (2) following the exceptions procedure and adopting an exception to the goal." Id. at 12, 706 P.2d 949. There, the city annexed and zoned land "to permit urban development," id. at 4, 706 P.2d 949, relying on the fact that the land was within a UGB which the city had adopted but LCDC had not acknowledged. We noted Goal 14's provision that once a UGB is "established," the land included within it is "urbanizable" and "available over time for urban uses." 300 Or. at 8, 706 P.2d 949. We rejected the argument that the city's UGB became "established" when the city adopted it; no UGB is "established" until LCDC has acknowledged it. Id. at 9, 706 P.2d 949. Since ORS 197.175(2)(c) requires cities and counties to "make land use decisions in compliance with the goals" until LCDC acknowledges their comprehensive plans, the city was required to either comply with each pertinent goal or adopt an exception to each. 300 Or. at 9-12, 706 P.2d 949.
We recognized in City of Rajneeshpuram that neither the language of Goal 14 nor our previous decisions addressed whether the exceptions process applies to Goal 14 when the proposed land use neither establishes nor changes a UGB. 300 Or. at 12, 706 P.2d 949. However, we found that "the policy embodied in the goal" provided an answer:
"[A] city should not convert rural land to urbanizable land or urban uses prior to inclusion within an acknowledged UGB. The purpose of the goal, which comports with the policy of the land use statutes in general, is `[t]o provide for an orderly and efficient transition from rural to urban land use.' This purpose is effected by the establishment of the UGB. Urbanization is to occur within a UGB adopted upon consideration of the seven establishment factors set forth in Goal 14 and subsequently acknowledged by LCDC." (Footnote omitted. Emphasis added.)
300 Or. at 12, 706 P.2d 949. Therefore, "[a] proposal to convert rural agricultural land to urban uses prior to inclusion within an acknowledged UGB" requires either meeting the requirements specified in Goal 14 or properly taking exception to that goal. Id.
Both 1000 Friends and LCDC interpret City of Rajneeshpuram as saying that any urbanization of "rural land" requires either compliance with, or an exception to, Goal 14. The county makes several arguments why that rule of law cannot apply to the type of land use decision involved here.
First, the county argues that City of Rajneeshpuram "does not state that Goal 14 prohibits urban uses on rural land but only that land use decisions affecting land within a proposed UGB may require Goal 14 compliance or exception." The county bases its argument on one sentence from the opinion: "Preacknowledgment land use decisions affecting land within the proposed UGB must comply with the individual goals, including the exceptions procedure * * *." (Emphasis added.) 300 Or. at 10, 706 P.2d 949.
The county's argument does not consider the context of that sentence and is inconsistent with the policy we noted as the reason for our decision. We spoke particularly about "land within the proposed UGB" only because the city had argued that its adoption of the proposed UGB excused it from showing compliance with the goals. However, the statute to which we referred, ORS 197.175(2)(c), requires all preacknowledgment "land use decisions" to be made "in compliance with the goals," regardless of where in the jurisdiction the affected lands are located. We held that the city must comply with or take exception to Goal 14 not because the annexed lands were also within the proposed UGB, but because, like those at issue here, they were not within an acknowledged UGB. To authorize urbanization of the county's lands without requiring it to comply with or take exception to Goal 14 would defeat the goal's purpose: "provid[ing] for an orderly *287 transition from rural to urban land use." Goal 14.
Second, the county claims that because none of the three cities' UGBs had been acknowledged when the county took its exceptions in 1982, "there is no requirement that Goal 14 be excepted or addressed." Based on the record before us, we think the county's factual premise is incorrect; the October 29, 1982, staff report refers to all three cities' UGBs as "acknowledged." The county's legal reasoning appears to be as follows:
(1) The decisions made before City of Rajneeshpuram, holding that Goal 14 applies to urbanization of lands outside established UGBs, emphasized the adverse impact that "intensification of development in rural areas" has on "nearby established UGBs."
(2) According to City of Rajneeshpuram, the three as-yet-unacknowledged UGBs were "without effect," 300 Or. at 10, 706 P.2d 949.
(3) Because there were no effective, established UGBs on which the county's development could have an impact, there was no need to consider Goal 14.
Again, the county fails to recognize that the policy of Goal 14 is to contain urbanization within acknowledged UGBs. To be sure, some of the cases which the county cites did emphasize the effect of various decisions on existing UGBs.[19] None, however, says that Goal 14 matters only when urbanization of "rural land" will undermine the effectiveness of an established UGB. The Court of Appeals, LCDC, and the Land Use Board of Appeals (LUBA)[20] have all indicated, even in cases where no particular threats to the integrity of established UGBs were noted, that Goal 14 generally prohibits urbanization of "rural land."[21] *288 The concern in City of Rajneeshpuram was not that this ill-fated community would attract development that otherwise would be contained within established UGBs, but that establishing new "urban uses" on rural land without properly considering Goal 14 amounts to intrinsically bad land use planning. The city's proposal would have violated Goal 14's policy of establishing urban growth boundaries "to identify and separate urbanizable land from rural land" and "not convert[ing] rural land to * * * urban uses prior to inclusion within an acknowledged UGB." 300 Or. at 12, 706 P.2d 949. Because the purpose of that policy is to contain urbanization within UGBs, if in fact no acknowledged UGBs existed in 1982 to contain Curry County's urbanization, the county should have planned its exceptions with special concern for compliance with Goal 14, rather than with no concern at all.
Third, the county argues that because Oregon law did not explicitly provide for taking exceptions to Goal 14 when the county took its exceptions to Goals 3 and 4, the county cannot be required to take such exceptions now. The county is correct that the law neither explicitly permitted nor required the taking of exceptions to Goal 14 until LCDC promulgated OAR chapter 660, division 14, in 1983. We cannot agree with 1000 Friends that LCDC's policy memorandum on the exceptions process[22] implied that local governments could take exceptions to Goal 14. That memorandum, at page 2, listed the goals (including 3 and 4) to which "[u]se of the Exceptions Process is normally limited," contrasting these with others, including Goal 14, for which "existing built-in conflict resolution mechanisms should be used."
However, from the fact that the county could not take exceptions to Goal 14 in 1982, it does not follow that this goal was irrelevant to its planning process. On the contrary, several opinions had held that "urban uses" of "rural land" outside UGBs violate Goal 14. See cases, supra, nn 19 and 21 (those decided before the December 14, 1982 Continuance Order in this case).[23] The lack of a provision for exceptions to Goal 14 in 1982, then, implied not that cities and counties could convert "rural land" to "urban uses" without applying Goal 14, but rather, that in considering such conversions, they should have applied the establishment and conversion factors of Goal 14, supra, 301 Or. at 455-456, 724 P.2d 276, even where no UGB was being established or changed.
The 1983 legislature, by passing ORS 197.732 (which "does not exclude any particular goal from its operation," City of Rajneeshpuram, 300 Or. at 13 n. 17, 706 P.2d 949), and LCDC, by "mak[ing] Goal 14 subject to the exceptions procedure," id., did not narrow, but rather liberalized, what local governments can do in the face of Goal 14. Cities and counties may now either comply with the goal or justify exceptions to it.
Finally, the county points to cases involving what it characterizes as "urban uses" outside UGBs in which the decisions did not indicate any concern about Goal 14 violations;[24] it argues these decisions imply that the goal does not prohibit urbanization outside UGBs. In none of these cases did *289 the Court of Appeals either indicate that the Goal 14 issue was raised by any party or discuss that issue in the decision. We decline to consider those silences more persuasive than our reasoning in City of Rajneeshpuram and the discussions by the Court of Appeals, LUBA and LCDC in the other cases, nn 19 and 21, supra, which have addressed the issue.
Conversion of "rural land" to "urban uses" must be supported either by compliance with the requirements of Goal 14 or by an exception to that goal. This conclusion follows from the goal's express purpose "[t]o provide for an orderly and efficient transition from rural to urban land use" and its provision that "[u]rban growth boundaries shall be established to identify and separate urbanizable land from rural land," from the policies discussed in City of Rajneeshpuram and in earlier cases prohibiting "urban uses" of "rural land," and from the provisions of ORS 197.732 and OAR chapter 660, divisions 4 and 14, authorizing the taking of exceptions to Goal 14. In practice, once an objector has charged that a decision affecting "rural land" outside an urban growth boundary is prohibited by Goal 14, a local government may do any one of three things: (1) make a record based on which LCDC enters a finding that the decision does not offend the goal because it does not in fact convert "rural land" to "urban uses"; (2) comply with Goal 14 by obtaining acknowledgment of an urban growth boundary, based upon considering of the factors specified in the goal; or (3) justify an exception to the goal.
Because LCDC's decision did not respond to 1000 Friends' objection in any of those three ways, it "erroneously interpreted a provision of law," namely Goal 14. See ORS 183.482(8)(a). The Court of Appeals' reason for affirming LCDC's disposition of the issue, that the county had taken exceptions to Goals 3 and 4 to allow the same use, similarly did not go to any of the three ways of properly meeting the concern that to allow the alleged "urban uses" offended Goal 14.
However, in this case LCDC and the county argue alternative grounds for affirming the result reached by LCDC and the Court of Appeals. In City of Rajneeshpuram, the city obtained no acknowledgment, attempted to justify no exceptions, and admitted that it was converting "rural land" to "urban uses." Here, the county has not attempted to extend any UGB to include the exceptions areas, but LCDC argues that the county did everything it would have had to do to justify exceptions to Goal 14, and the county argues that its exceptions areas do not in fact convert "rural land" to "urban uses." If this court could properly determine either that the county has performed the functional equivalent of exceptions to Goal 14 or that the county's plan does not convert any "rural land" to "urban uses," then there could have been no error in LCDC's decision not to require exceptions to Goal 14. There would be no reason to "set aside or modify the order" or to "remand the case" to LCDC, because the "correct interpretation" of Goal 14 in this particular case would compel no further "particular action" by LCDC, see ORS 183.482(8)(a), once we determined that there was no need for exceptions to Goal 14.
B. Requirements for Exceptions to Goals 3, 4 and 14
LCDC argues that when the taking of exceptions to Goals 3, and 4 "indirectly but effectively results in the equivalency of an exception to Goal 14," a local government need not take a "committed" exception to Goal 14. Although the county's planning documents did not purport to justify any exceptions to Goal 14, and neither the staff report nor LCDC's acknowledgment order suggested that the plan did so, LCDC argues to us that the county's committed exceptions to Goals 3 and 4 satisfied the requirements for exceptions to Goal 14. The Court of Appeals seemed uncertain whether 1000 Friends was arguing for exceptions to Goal 14 in addition to or as an alternative to exceptions to Goals 3 and 4. See 73 Or.App. at 356-358 and nn. 3-4, 698 *290 P.2d 1027. Because it found no cases holding that local governments that take exceptions to Goals 3 and 4 "to permit the nonresource use of land subject to the resource use requirements of those goals" must also take exceptions to Goal 14 "in order to allow the same use," and because Goals 3 and 4 "specifically regulate the use of [resource] land," the Court of Appeals found no "legal or logical reason" why the county should also have to take exceptions to Goal 14. Id. at 357-58, 698 P.2d 1027. Thus, while 1000 Friends and LCDC agreed before this court, and we have held here, that local governments which convert "rural land" outside the UGBs to "urban uses" must either comply with or take exceptions to Goal 14, both LCDC and the Court of Appeals disposed of this case without expressing any view concerning either (1) what must be done to justify exceptions to Goal 14 or (2) precisely when such exceptions are required. There is no finding in either's decision, therefore, which purports to determine that (as LCDC now claims for the first time) the county's exceptions to Goals 3 and 4 sufficed as exceptions to Goal 14.
Under the circumstances of this case, we must therefore determine as a matter of law the requirements for taking exceptions to Goal 14 and then examine whether either LCDC's findings, "which set[ ] forth the basis for the approval * * * of acknowledgment," ORS 197.251(5), or the county's findings and statements of reasons for approving the exceptions, ORS 197.732(4) and (6), can be read to satisfy those requirements. We hold that properly taken "committed" exceptions to resource goals do not necessarily meet the requirements for "committed" exceptions to Goal 14 and that the specific exceptions taken here failed to meet those requirements.
We need not compare the requirements for "reasons" exceptions to the various goals. If the county's exceptions to Goals 3 and 4 sufficed for "built" or "committed" exceptions to Goal 14, "reasons" exceptions for the same land would be redundant, because only one kind of exception is needed for any particular piece of land. See OAR 660-14-040(1) and (2) (requirement that "reasons" exception to Goal 14 be taken for "establishment of new urban development on undeveloped rural land" does not apply to "land subject to built and committed exceptions to Goals 3 or 4 but * * * developed at urban density or committed to urban level development.") (Emphasis added.). If they did not suffice, the county justified no exceptions to Goal 14, because all parties agree that the county did none of the analysis necessary to justify "reasons" exceptions.
The parties focus the argument on requirements for "committed" exceptions but also appear to disagree about "built" exceptions. In the Court of Appeals, 1000 Friends conceded that "[w]here [urban uses of rural lands] already exist, obviously a Goal 14 exception is not necessary." LCDC and the county agree. In this court, however, 1000 Friends says that a "built" exception to Goal 3 or 4 "obviously" differs from the same kind of exception to Goal 14 because
"an area can be lightly developed in such a way that agriculture is rendered impracticable but the land may still qualify under the definition of rural lands. Land which is built upon such that agriculture is impracticable may have a residential density of one house per 10 acres, which is clearly not an urban intensity of development."
Because this is the same point 1000 Friends makes in the more elaborate argument on "committed" exceptions, we shall return to it after resolving that argument.
1. The Administrative Rules for "Committed" Exceptions
Either of two administrative rules might apply to the taking of "committed" exceptions to Goal 14. Division 4 of OAR chapter 660 "interprets the exceptions process as it applies to statewide Goals 3 to 19," except as provided for in division 14 of the same chapter. OAR 660-04-000(1). Division 4 also contains a general rule for "committed" exceptions. OAR 660-04-028.
*291 The scope of division 14 is unclear. It is entitled "Administrative Rule for Application of the Statewide Planning Goals to the Incorporation of New Cities," and the section on its purpose provides:
"ORS 197.175 requires cities and counties to exercise their planning and zoning responsibilities in compliance with the Statewide Planning Goals. This includes, but is not limited to, a city or special district boundary change including the incorporation or annexation of unincorporated territory. The purpose of this rule is to clarify the requirements of Goal 14 and to provide guidance to cities, counties and local government boundary commissions regarding incorporation of new cities under the Goals. This rule specifies the satisfactory method of applying Statewide Planning Goals 2, 3, 4, 11 and 14 to the incorporation of new cities." (Emphasis added.)
OAR 660-14-000. Division 14 contains a provision entitled "Incorporation of New Cities on Rural Lands Irrevocably Committed to Urban Levels of Development." OAR 660-14-030. The county maintains that since no incorporation is involved here, division 14 does not apply. However, both 1000 Friends and LCDC refer to OAR 660-14-030 as "the Goal 14 rule" for committed exceptions, as if it applies in contexts other than incorporation.
We believe OAR 660-14-030 governs all "committed" exceptions to Goal 14. While three of its six sections appear to limit it to situations where there is an area "proposed for incorporation,"[25] the other three speak generally of decisions that land is "irrevocably committed to urban levels of development."[26] The latter sections *292 state the general rule for determining commitment and factors to be considered in deciding whether land is "committed." Further, the "purpose" of the rules in division 14 is not only to provide guidance for incorporation of new cities, but also "to clarify the requirements of Goal 14" generally. OAR 660-14-000. OAR 660-14-030 is also more specifically tailored to the taking of exceptions to Goal 14 than is the general "committed" exceptions rule, OAR 660-04-028. The former describes factors considered and findings required to determine that land is "committed to urban development," OAR 660-14-030, see nn 25-26, supra (all subsections), while the latter speaks only generally of "commit[ment] to uses not allowed by the applicable goal," OAR 660-04-028(1) and (3), or factors which prevent the "resource use" of lands. OAR 660-04-028(2)(c)(A).
The county argues that the validity of all the rules in division 14 "is in some doubt" after Wasco County Court. In that opinion we said that another provision, OAR 660-14-010(1), did not warrant our deference to agency interpretation because it varied from the policy and standards of Goal 14 and amounted to a de facto goal amendment. See 299 Or. at 350, 369, 703 P.2d 207. Relying on Wasco County Court, the Court of Appeals has declared that rule invalid as beyond LCDC's statutory authority. McKnight v. LCDC, 74 Or.App. 627, 629-30, 704 P.2d 1153 (1985).
However, neither Wasco County Court nor McKnight expresses any view about other rules in division 14, and the county does not explain how the decisions call these rules into question. Wasco County Court held that OAR 660-14-010(1) varied from the policies and standards of Goal 14 because the rule required an exception for an incorporation decision which could not by itself convert "rural land" to "urban uses"; by contrast, the county's decision to actually plan and zone land in particular ways possibly does so. See, infra, Part III.C. The county offers no reason to question the validity of OAR 660-14-030, and we hold that it is a valid rule which applies in this case.
The rule for "committed" exceptions to Goal 14, OAR 660-14-030, requires a more exacting analysis than does OAR 660-04-028, which governs "committed" exceptions to Goals 3 and 4.[27] OAR 660-04-028(3) requires only that "one or more" of several factors (of which parcel size and ownership patterns seem the most important) makes resource use impracticable upon the land.[28] The corresponding part of
*293 OAR 660-14-030 explicitly recognizes that lands may be built or committed to different intensities of development; it requires that local governments explain, based on "all of the factors" listed in the rule, the level of development to which the land is committed, and why. See OAR 660-14-030(2), (3) and (4), supra, nn 25 and 26 (emphasized portions other than "proposed for incorporation"). The division 14 rule also requires closer scrutiny of the intensity of development to which each individual parcel is built, committed, and suitable. OAR 660-04-028(4) provides in part:

"Findings of fact and a statement of reasons that land subject to an exception is physically developed or irrevocably committed need not be prepared or adopted for individual parcels separately. Such units of land may be considered in combination as a single exception area. * * *" (Emphasis added.)
OAR 660-14-030(5) and (6) provide:
"(5) Larger parcels or ownerships on the periphery of an area committed to urban densities may only be considered committed to urban development and included in the area proposed for incorporation if findings of fact demonstrate:

"(a) Urban levels of facilities are currently provided to the parcel; and
"(b) The parcel is irrevocably committed to nonresource use or is not resource land; and
"(c) The parcel can reasonably be developed for urban density uses considering topography, natural hazards or other constraints on site development.
"(6) More detailed findings and reasons must be provided to demonstrate that land is committed to urban development than would be if the land is currently built upon at urban densities. Land which cannot be shown to be built to urban densities or committed to urban development may not be included within the area proposed for incorporation, except as provided for in OAR 660-14-040." (Emphasis added.)
Thus, it is entirely possible to take exceptions to Goal 3, Goal 4, or another resource goal without considering factors or making findings which LCDC has established as critical to taking of exceptions to Goal 14.

2. Substantive Requirements for Exceptions

Even if exceptions to the resource goals and to Goal 14 were governed by the same administrative rule, the former would not generally suffice to meet the requirements for the latter. The analysis that must be done to justify exceptions to each goal, and the uses which exceptions to each goal allow, are quite different. Each goal requires and allows different kinds of uses; therefore, justifying "committed" exceptions to different goals requires findings that different kinds of uses are "impracticable." See ORS 197.732(1)(b). Exceptions to Goals 3, 4 and other resource goals cannot generally suffice as exceptions to Goal 14 because the former necessitate only a determination that a narrow category of uses, the particular resource uses required by the goal, are impracticable, while the latter necessitates a finding that not merely resource uses, but all other rural uses, are impracticable.

a. The resource goals

The parties agree that to justify a "committed" exception to Goal 3's requirement that "[a]gricultural lands shall be preserved *294 and maintained for farm use," Planning Goals at 6, a local government must show that the land cannot practicably be used for farming. Similarly, a "committed" exception to Goal 4's requirement that "[f]orest land shall be retained for the production of wood fibre and other forest uses," id., requires proof that the land cannot practicably be put to "forest uses," as defined elsewhere in Goal 4. See, supra, Part I.B., 301 Or. at 454, 724 P.2d 275. To justify a "committed" exception to any resource goal, a local government need only demonstrate that some level of development existing on adjacent land makes that resource use impracticable on the land.
The parties disagree, however, about what uses were allowed once the county took exceptions to Goal 3 or Goal 4. The county says that no provision of ORS 197.732, ORS chapter 215 (governing county planning and zoning), Goal 2, or OAR chapter 660 requires local governments to identify either the purposes of, or the proposed zoning for, a "committed" exceptions area. However, Goal 2 requires that the "implementation measures," including zoning ordinances, must be "consistent" with the plan, and ORS 197.250 requires that all land use provisions be "in compliance" with the goals. These "regulating realities," the county says, restrict allowable uses in the exceptions areas to "rural levels of uses, public facilities and services and development."
LCDC and amicus Metro say that exceptions to Goals 3 and 4 will allow any level of development that is no more intense than the existing adjacent uses which were used to justify the exceptions. Metro argues that if the basis in fact for determining that the commitment has occurred is that adjacent lands have been developed at urban densities, then the "committed" exceptions area may be filled in at "the identical urban density." LCDC asserts that if the "basis for the exception is a rural level of development and commitment," only a "rural level of development" is allowed.
1000 Friends says that "committed" exceptions to Goals 3 and 4 do not affirmatively authorize any particular uses:
"The terminology of `commitment' is misleading because the county's only determination concerned the impracticability of agriculture on these properties. It did not consider whether particular nonagricultural uses must be developed on those properties, because that is not part of the test. * * * This kind of exception is called a `commitment' exception implying a positive determination of the prospective non-agricultural use of the land. But in application it is a purely negative determination that one kind of use, agriculture, is no longer practicable. * * * [E]vidence is always and only directed toward the negative determination of the `impracticability' of agriculture and not what use can or should be allowed on those parcels found to be `built' or `committed.'"
[6] We agree with 1000 Friends that an exception to Goal 3 or 4 does not, by itself, authorize particular uses of land. On the one hand, exceptions and other "regulating realities" do not limit uses in Goals 3 and 4 exceptions areas to "rural" ones as the county asserts. The plan and the zoning ordinances must be consistent with each other and in compliance with the goals, but Goal 2 and the statutes cited by the county do not indicate that the finding of impracticability for farm or forest use limits uses of land to rural ones. Such a finding only removes one restriction on the use of land, the requirement of resource use, making nonresource use possible. Only the other goals, e.g., Goal 14, not any limitations contained within the resource goal exception itself, restrict the types of nonresource uses that the county may authorize in its zoning ordinances.
On the other hand, LCDC and Metro are incorrect that the existing level of development in adjacent areas is a justification for affirmatively authorizing like uses in the "committed" areas. The "basis" for an exception to a resource goal is that a particular resource use is impracticable, and *295 any "existing adjacent uses and other relevant factors" which make resource use impracticable will justify an exception. ORS 197.732(1)(b). Because no finding that adjacent uses are "urban" is necessary to the conclusion that farming or forestry is impracticable, an explicit or implicit finding that the existing adjacent uses are "urban" cannot be the "basis" for an exception to Goal 3 or 4. LCDC's own rules, moreover, do not allow a local government which merely shows that resource uses are impracticable to conclude that other uses are also impracticable so as to authorize uses that would require exceptions to other goals:
"An exception to one goal or goal requirement does not assure compliance with any other applicable goals or goal requirements for the proposed uses at the exception site. Therefore, an exception to exclude certain lands from the requirements of one or more statewide goals * * * does not exempt a local government from the requirements of any goal(s) for which an exception was not taken."
OAR 660-04-010(3).
By themselves, the county's exceptions to Goals 3 and 4 could neither define all restrictions upon uses of lands in the exceptions areas nor authorize particular uses of these lands. Those exceptions could suffice as exceptions to Goal 14 only if the showing that farm and forest uses were impracticable also established whatever is necessary to show that uses which Goal 14 allows outside UGBs were impracticable. See ORS 197.732(1)(b).
b. Goal 14
All three parties agree that commitment to nonresource use does not necessarily establish commitment to "urban uses," but LCDC and 1000 Friends disagree about what must be shown to be "impracticable" in order to justify an exception to Goal 14. LCDC says the required finding is that it is "impracticable to prohibit urban uses" on the land proposed for the exceptions area, while 1000 Friends contends the question should be whether it is "impracticable to allow rural uses." At first this seems like a distinction that makes no difference, but oral argument and post-argument responses have convinced us otherwise.
LCDC maintains that "even if a rural use is theoretically practicable an exception allowing urban uses may be taken if the county finds that it is impracticable to prohibit urban uses." For example, in a hypothetical area with some small, urban-sized developed parcels interspersed among large undeveloped lots, LCDC would find that it was impracticable to prohibit "urban uses" in the area as a whole and would allow "committed" exceptions for the undeveloped areas.
LCDC cites its approval of Clackamas County's Mount Hood Corridor Plan as an example of its interpretation.[29] There, the majority of a proposed 2,000-acre "committed" exceptions area was developed, divided into small parcels, and provided with community water, schools, fire, transportation and solid waste disposal services which LCDC called "urban in nature," but the area also included a 400-acre area of large, undeveloped lots. A recently-created sewer service district, which was constructing a $5.3 million treatment plant financed by taxes assessed on all district properties, annexed the undeveloped area. LCDC asserts that in the Mt. Hood Corridor case it "concluded that the area was committed to urban uses, that an exception therefore had been justified, and that the urban planning and zoning designations within the undeveloped portions of the corridor could legally remain." (Emphasis added.) Had the inquiry been whether it was impracticable to allow rural uses, LCDC says, "no exception to allow urban uses could have been justified. As to all the undeveloped *296 land, the $5.3 million public investment would have been lost." LCDC's analysis there, it maintains, "in essence * * * demonstrated that it was impracticable to prohibit urban uses in light of existing levels of development, parcelization, and public facilities and services." Since "Goal 14 regulates urbanization, * * * the practicability of `rural uses' is not an appropriate inquiry."
1000 Friends argues that if rural uses are "practicable (meaning possible in actual practice)" on land outside a UGB, then a county cannot allow "urban uses" there; it denies that its argument is based, as LCDC asserts, on what may be "theoretically practicable." Thus, in the hypothetical area referred to above, 1000 Friends would not allow "urban uses" on the large undeveloped lots if any "rural uses" are possible in actual practice. The parties cite no provision of Oregon law defining "rural uses," but 1000 Friends assumes, and the other parties agree, that these include the uses referred to in the Goal definition of "Rural Land":
"Rural lands are those which are outside the urban growth boundary and are
"(a) Non-urban agricultural, forest or open space lands or,
"(b) Other lands suitable for sparse settlement, small farms, or acreage homesites with no or hardly any public services, and which are not suitable, necessary, or intended for urban use." (Emphasis added.)
Planning Goals at 24. 1000 Friends concludes that unless it is impracticable to use land for sparse settlement, small farms, or acreage homesites with few public services, no exception to Goal 14 is justified.
1000 Friends maintains that both the statutory language and the Mt. Hood Corridor case support its position. ORS 197.732(1)(b) and OAR 660-04-028(1) require a finding that "uses allowed by the applicable goal" are "impracticable," so the inquiry should be about the practicability of the allowed use (rural), not of some land use action by the county (prohibiting urban use). As for the Mt. Hood Corridor, 1000 Friends says that LCDC failed to explain why 10-acre residential lots (characterized by 1000 Friends as a rural use) were impracticable and that the service district incorrectly assumed that all its lands would be developed to "urban types and densities of uses."
[7] We hold that the statute requires local governments to support any exceptions to Goal 14 by demonstrating that it is impracticable to allow any rural uses in the exceptions area. ORS 197.732(1)(b) says unambiguously that "the uses allowed by the applicable goal" must be shown to be "impracticable." (Emphasis added.) LCDC adheres to this mandate in what it requires for exceptions to Goals 3 (farm use is impracticable) and 4 (forest use is impracticable), but inexplicably abandons this focus on the "uses allowed by" the goals in addressing Goal 14, creating what it admitted in oral argument is a "double negative." The statute does not permit LCDC to invert the inquiry depending on the goal to which exception is being taken.
The interpretation LCDC urged before this court also undermines the policy of the land use goals. The integrity of the planning system depends on planners starting from the assumption that lands will be used in compliance with the goals, unless "specific circumstances justify departure from the state policy embodied in a particular goal." See City of Rajneeshpuram, 300 Or. at 11, 706 P.2d 949 (referring to exceptions process). As to Goals 3 and 4, LCDC starts by assuming that land must be preserved for resource uses and evaluates the practicability of using it for those purposes. The practice LCDC now advocates for exceptions to Goal 14 would go backward. It would allow local governments to start by asking whether any uses of the kind which the goal prohibits"urban uses"can be found in a given area outside the UGB and, if so, would allow local governments to find commitment of that entire area to "urban uses" on grounds that it is impracticable to entirely *297 prohibit in an area uses that have already gained a foothold there.
LCDC's approach would thus invite a kind of bootstrapping that could thwart the policy of Goal 14. Because local governments and LCDC would not need to inquire what uses allowed by Goal 14 were still practicable on as-yet-undeveloped parcels, there would be nothing to limit the size of exceptions areas. Any local government which wished to create additional urbanizable land without going to the trouble of extending a UGB in compliance with Goal 14, or which disagreed with state land use planning mandates and wished to defy the system,[30] could draw the lines of an exceptions area around as much land as it wanted, so long as the area contained some "urban" development which self-evidently would be "impracticable to prohibit." Unless the analysis supporting a "committed" exception focuses on how the existing development affects the practicable uses of the lands which are not yet developed, neither the local government nor LCDC has a basis for determining the geographical limits of the areas which are "committed" and for limiting urbanization outside UGBs.
The merits of the Mt. Hood Corridor decision are not before us, and the portions of that decision to which LCDC directs our attention do not support its interpretation of the standard for exceptions to Goal 14. The portion of the staff report in that case cited by LCDC characterizes the sewer system as an "urban service," but it makes no express finding that the entire service district, including the undeveloped 400 acres, is committed to "urban uses"; on the contrary, it discusses whether all the facts concerning the area "commit resource lands to nonresource use." That 1981 report does not mention how Goal 14 applies to the area and, indeed, was written two years before LCDC promulgated the rules which provide for exceptions to that goal. See, supra, 301 Or. at 460, 724 P.2d 279. The only reference to Goal 14 is in a later report where the staff rejects a challenge to designation of "urban" boundaries around unincorporated communities in the corridor:
"* * * Goal 14 boundaries are not required for these communities since they are unincorporated and do not meet the Statewide Goal's definition of `urban land' which require such boundaries. A proper exception for each of these communities has been adopted by the County and no attempt to justify a Goal 14 urban growth boundary was made."
In other words, the staff believed (as in the staff report and acknowledgment order here, but not as in some other cases, see nn 19, 21, supra ) that Goal 14 did not apply because no fixing of a UGB was involved; LCDC, LUBA, and we have since rejected that position. See generally Part III.A., supra. While the existing development in that case may well have been "urban" as that term is commonly understood, the staff articulated the justification for the land use decision in terms of commitment only to "nonresource" uses, not to "urban uses." In that case, LCDC did not recognize the need to determine, and it did not determine, whether all the land within the Goals 3 and 4 exceptions areas was committed to "urban uses."
We do not think that the Mt. Hood Corridor decision, made without acknowledging the applicability of Goal 14, without determining whether critical portions of the lands at issue were "committed" to "urban uses," and before the law provided for exceptions to Goal 14, established a model for taking exceptions to that goal. As LCDC describes the decision, the risk of losing a public investment became an excuse for sweeping aside all consideration of Goal 14, rather than a factor in the analysis which that goal and the exceptions process require. If investment and financing schemes make all rural uses impracticable (e.g., economically impracticable), they may justify a "committed" exception to Goal 14 *298 under the proper test. If they do not establish that impracticability, they merely serve as an impermissible pretext for the evasion of Goal 14.

3. The County's Exceptions and the Requirements

LCDC's acknowledgment order was required to include "a clear statement of findings which sets forth the basis for the approval * * * of acknowledgment," ORS 197.251(5), and, because the plan it acknowledged contained exceptions, was also required to contain "a clear statement of reasons which sets forth the basis for the determination that the standards of [ORS 197.732(1), for adopting exceptions] have * * * been met." ORS 197.732(6)(c). Those findings and reasons could be based only upon a review confined to the record made before the county, comments and objections, the staff report, and oral arguments permitted by LCDC. ORS 197.251(4). Our review of LCDC's order is similarly "confined to the record." ORS 197.650(1), 183.482(7). We hold that LCDC made no "statement of reasons" which could support a conclusion that the county satisfied the ORS 197.732(1)(b) requirements for exceptions to Goal 14 and that the record does not show that the county satisfied those requirements.
[8] First, nothing in LCDC's staff report or acknowledgment order demonstrates or sets forth any basis for concluding that it would be impracticable to allow any rural uses in the "committed" exceptions areas. The 1982 staff report stated only that the areas were committed to "nonfarm and nonforest uses." In the 1984 report, LCDC stated, regarding some areas, that the land was committed to "residential" and other uses distinguished from "resource" uses, and regarding others that the facts supported the county's decision to "commit" lands without stating to what the lands were being committed. LCDC did not state that the commitment was to anything more definite than nonresource use or that it would be impracticable to use at least some of the lands for "sparse settlement, small farms, or acreage homesites with no or hardly any public services." See Definition of "Rural Land," part (b), supra, 301 Or. at 489, 724 P.2d 296. To the contrary, for example, LCDC's characterization of the 71 "Developed and Committed Residential Lands" exceptions areas (i.e., all but the "Rural Communities" and "Undeveloped Subdivisions") indicates that such rural, nonresource uses could be, arguably, quite practicable:
"[A]ll these areas are comprised primarily of small lots less than 5 acres with dwellings interspersed with other similarly small vacant lots primarily in separate ownerships and distinctly smaller and separate from the much larger adjacent parcels designated for farm and forest uses."
For the "Undeveloped Subdivision" exception acknowledged in 1982, LCDC specifically said only that the land was "`irrevocably committed' to nonfarm and nonforest uses," (emphasis added), and LCDC's 1984 findings concerning two of the "Rural Communities" focus on explaining why resource use is impracticable on several large parcels. LCDC's findings cannot be read to state that the standards for exceptions to Goal 14 have been met. ORS 197.732(6).
Second, even assuming that when LCDC has not set forth a basis for exceptions to a goal, we could examine the local government's "findings of fact and * * * statement of reasons," ORS 197.732(4), to see if they can be read to set forth such a basis, we could not find "substantial evidence" in this record of a basis for "committed exceptions" to Goal 14. See ORS 183.482(8)(c). The Committed Lands Document as amended January 30, 1984, focuses on showing that land is "committed to nonresource use" and does not purport to show that the development on the "built" parcels or the existing level of public services makes "sparse settlement, small farms, or acreage homesites," definition of "Rural Land," supra, impracticable on the "committed" parcels. The county says that several larger (28 to 40-acre) parcels in some rural communities (Langlois, *299 Ophir, and Nesika Beach) "can" or "could" be developed to "higher density" residential or "more intensive" commercial uses, but does not state why these or any other lands cannot practicably be put to nonresource rural uses. Like LCDC's orders and staff reports, the county's planning documents do not even acknowledge either the application of Goal 14 or the question whether the level of development to which these lands is "committed" is "urban," as issues in this case.
LCDC notes that the county, in taking its exceptions to Goals 3 and 4, did consider such factors as "the location[,] number and density of existing residential, commercial and industrial uses; availability of facilities and services; and parcel size and ownership patterns," factors very like those which the rule for "committed" exceptions to Goal 14 now requires to be addressed in a "decision that the land is committed to urban levels of development." Cf. OAR 660-14-030(3), set forth in n 26, supra. However, mere consideration and discussion of those factors cannot justify exceptions to Goal 14 if that process does not result in findings that the land is "committed to urban levels of development." The county did not make such findings, and LCDC's decision contained no statement that the county had done so. To take only one example where the record shows that the county could not have done so consistently with the administrative rules, we note that while OAR 660-14-030(3)(c) states that a decision that land is committed to urban development shall be based in part on a finding that the land has "urban levels of facilities and services[,] including at least public water and sewer facilities," the Committed Lands Document states that Agness has no public water or sewer facilities.
The "Urbanization" chapter of the county's Comprehensive Plan does discuss the Rural Communities and other exceptions areas. It says that most Rural Communities are defined by boundaries of principal utility (water or fire) districts "delineating the land area in which services can be provided that allow for higher density residential development." A brief description of each community follows, summarizing the same information as in the Committed Lands Document. The county describes the other exceptions areas as "other rural lands outside [UGBs] and rural communities which are substantially committed to nonresource use by the nature of existing land parcelization, physical development of parcels, clustering of development uses, and relationship to transportation routes, urban growth areas, and other special characteristics of the area." It says that 1,428 additional homes could be provided on the vacant lots within these areas, compares this additional capacity with projected population growth, and concludes that 1,829 more units outside of UGBs and exceptions areas will be needed to accommodate that growth. Later the county called its population estimate "inflated" and lowered it to eliminate the need for the 1,829 units. In its "Plan Policies Regarding Urbanization," the county concluded that it

"recognized the rural communities * * as an additional element of urbanization and * * * determined boundaries * * * based on the organized public utility districts and the existing land use * * [and] recognizes rural lands * * * and their use of individual water sources and septic systems for sewage disposal and seeks to retain the rural character of these lands by limiting the development of higher levels of public facilities which will change the density of development." (Emphasis added.)
LCDC did not consider whether that chapter of the Comprehensive Plan established commitment to "urban uses," and we cannot conclude that the plan did so. In three of the rural communities (Langlois, Ophir, and Nesika Beach), the county found that the lack of sewer systems "necessitates a large lot size for development use." Agness also lacks public water service. The discussions of "potential infill" in each community focus on future "growth needs" (based on the earlier, inflated projection) rather than considering which areas, if any, cannot practicably be put to nonresource *300 rural uses. The county characterizes what it did as recognizing the exceptions areas as an "element of urbanization," but its planning documents do not justify its having done so, because they do not even purport to show which areas, if any, are "committed" to "urban uses" under the proper legal standard.
Even if we inquired, as LCDC urges, whether it was impracticable to prohibit "urban uses," we would reach the same conclusion. We cannot conclude that it is impracticable to prohibit "urban uses" in any of the county's exceptions areas, because neither the county's planning documents nor LCDC's orders and reports (as distinguished from its lawyer's argument before us) contain any findings or statements that the existing level of development is "urban." Indeed, after oral argument, the county stated that it "has never (nor has it been LCDC required) found in any of its committed areas that `it is impracticable to prohibit urban uses.'" Even if we assume that the land "committed" has been zoned for "infill" on parcels no smaller than those in the adjacent "built" areas, nothing in the record purports to show or to find that parcels of that size, which may be "impracticable to prohibit," is urban. Nothing even approaches the findings in the Mt. Hood Corridor case that the level of services was "urban" and that part of the investment in sewer services might be lost if further development was stopped. Thus, LCDC did not find, the record contains no basis for finding, and we cannot conclude that the uses that justified the exceptions to Goals 3 and 4the uses which it would be "impracticable to prohibit"were "urban."
As stated earlier, the taking of exceptions to Goals 3 and 4 generally cannot, as LCDC suggests, "indirectly but effectively result in the equivalency of an exception to Goal 14." To take an exception to Goal 3 or 4, a local government need only show that commercial farm or forest use is impracticable, but to take an exception to Goal 14 the local government must show that it is impracticable to allow not only resource use, but also all other rural uses including "sparse settlement, small farms, or acreage homesites." Definition of Rural Land, Planning Goals at 24. The Court of Appeals erred in not recognizing that the greater showing required for exceptions to Goal 14 is the "legal or logical reason" why a local government which converts "rural land" to "urban uses" "should be required to supplement its exceptions to [resource] goals with an exception to Goal 14." See 73 Or.App. at 358, 698 P.2d 1027. It would be possible, of course, for a local government's analysis in support of exceptions to Goals 3 and 4 to contain findings that not only resource uses, but all rural uses, were impracticable, and for LCDC's report and order on review to so state. There is no way to read this record to say that. LCDC's theory that the local government need only show that the "built" uses are "urban" is incorrect, because that showing alone does not determine what is practicable on lands not yet developed. LCDC, in any event, did not find that the county had made such a showing, and the record does not show that the uses are "urban." The theory LCDC presented to this court finds no support in the law and in this case could only be an after-the-fact rationalization because the record contains no evidence that either the county or LCDC applied that theory in their decisions.

4. The "Built" Exceptions

We also hold that the requirements for "built" exceptions to Goal 14 differ from those for Goals 3 and 4. 1000 Friends is incorrect that the "built" exception requires any determination of "impracticability." The question is whether the land is "physically developed to the extent that it is no longer available for uses allowed by the applicable goal." (Emphasis added.) ORS 197.732(1)(a). While "built" exceptions, unlike "committed" exceptions, do not require analysis of how development of some parcels affects practicable uses of others, the requirements for "built" exceptions to resource goals and to Goal 14 differ in the same manner as do requirements for committed exceptions. *301 Proof that land is "no longer available" for farming or forestry does not establish that it is not available for "sparse settlement, small farms or acreage homesites with no or hardly any public services." Definition of "Rural Land," supra. For example, proof that land has been partitioned into 10-acre lots, each with a rural homesite and too small for commercial farming, would not by itself support zoning of that land for half-acre lots, apartments, or shopping centers. A local government that wants to zone land outside a UGB for urban uses based on a "built" exception to Goal 14 must show that the land has already been "physically developed" to "urban" levels and is no longer available for any rural uses. Here, LCDC did not find, and the record does not show, which, if any, uses in the "built" areas are "urban."
Because the county's exceptions to Goals 3 and 4 did not meet the requirements for exceptions to Goal 14, LCDC's acknowledgment order cannot stand if exceptions to Goal 14 were required in this case. Whether exceptions to Goal 14 were required turns on whether the county's plan permits the conversion of "rural land" to "urban uses."

C. Conversion of Rural Land to Urban Uses

In Part III.A., supra, we have reaffirmed our holding in City of Rajneeshpuram that a local government may not "convert rural land" outside UGBs to "urban uses" unless it complies with or takes exception to Goal 14, 300 Or. at 12, 706 P.2d 949, and, in Part III.B., supra, have decided that what the county and LCDC did here did not suffice as compliance or as an exception. In this case, unlike City of Rajneeshpuram, the parties dispute whether "rural land" is being "converted" to "urban uses."

1. Rural Land

We must first decide whether the county's exceptions areas are "rural land." LCDC's definitions and other phrases introduced by the parties create uncertainty, but the only reasonable construction of all these terms indicates that the areas are indeed "rural land."
Goal 14 uses the terms "urban," "urbanizable," and "rural" land. See the definitions set forth, supra, Part I.B. For purposes of Goal 14 analysis, we have assumed that all lands are either "urban," "urbanizable," or "rural." See Wasco County Court, 299 Or. at 350-51, 703 P.2d 207; Goal 14 Amendment Case, supra, 292 Or. at 737-38, 642 P.2d 1158.
Some language in the definitions, however, suggests that our assumption may have been incorrect. Land can be "urbanizable" only if it is within a UGB, and "rural" only if it is outside, but the definition of "rural land" can be read not to include absolutely all lands outside the UGB. It appears that to be "rural," lands outside the UGB must also be either resource land (part (a) of definition), or sparsely settled land "not suitable, necessary, or intended for urban use" (part (b)). See Definition of "Rural Land," supra, 301 Or. at 489, 724 P.2d 296. Whatever else is out there is not "rural." Similarly, it appears there could be lands which are within a UGB but do not satisfy parts (a), (b), and (c) of the "Urbanizable Land" definition. See Definition of "Urbanizable Land," supra, 301 Or. at 456, 724 P.2d 276. The definitions and goals do not label or say what is to be done about these hypothetical non-rural and non-urbanizable lands. See supra, 301 Or. at 456, 724 P.2d 276.
When a UGB is acknowledged, lands become "urban," "urbanizable," and "rural" as described in the definitions. The Court of Appeals' reasoning in Willamette University v. LCDC, 45 Or.App. 355, 369, 608 P.2d 1178 (1980), is persuasive:
"While Goal 14 provides that all land within an acknowledged urban growth boundary is either urban or urbanizable, the definition of the term urbanizable land appears to impose three additional conditions before land is [to] be regarded as urbanizable. Yet these three elements *302 of the definition are essentially the same as some of the seven factors listed in Goal 14 for consideration in establishing an urban growth boundary in the first place.
"On balance, we are only able to conclude that urban and urbanizable lands lie within an acknowledged urban growth boundary while rural lands lie outside an acknowledged urban growth boundary.
"* * * * *
"The above definitions make the most sense after a city's comprehensive plan, including an urban growth boundary, has been acknowledged by LCDC to comply with the statewide planning goals; they do not provide clear guidance for pre-acknowledgment application of the goals." (Emphasis in original.)
Goal 14 cannot be made to work under any other interpretation. The goal says that UGBs shall "identify and separate urbanizable land from rural land." (Emphasis added.) Planning Goals at 13. Thus, no land is "rural" or "urbanizable" for purposes of the goals until a UGB has been acknowledged. The process of establishing a UGB determines which lands are "not suitable, necessary, or intended for urban use" and will remain "rural land." See Definition of "Rural Land," supra. The portions of the definition of "rural land" following the statement that it is "outside the [UGB]" describe two types of land which exist outside the UGB once it has been acknowledged: "part (a)" resource lands and "part (b)" lands for which exceptions to a resource goal have been taken. See Braat v. Morrow Cty, 3 LCDC 207, 213 (1980) (exception to Goal 3 must be taken to allow uses described in Part (b) of definition).
Both 1000 Friends, in speaking of "a continuum, urban, rural, and something in between," and LCDC, in referring to "quasi-urban" land, suggest that there is some land outside UGBs that is not "rural." The definitions and Goal 14, however, establish not a "continuum" but categories of land. "Rural land" is of the two types described by parts (a) and (b) of the definition. The "something in between" "rural land" and "urban land" is obviously "urbanizable land," that land within the UGB which has not yet been converted to "urban uses." The "something in between" rural resource lands (part (a) of definition) and "urbanizable land" is "part (b)" rural land, that land excepted from resource uses but not included within a UGB. The "something in between" "part (b)" rural land and "urbanizable land" is the same thing that LCDC calls "quasi-urban" land.
"Quasi-urban" is the term LCDC and LUBA use to describe development of urban-like intensity located outside incorporated cities and UGBs.[31] LCDC and LUBA avoid labeling this development "urban" because the definition of "urban land" requires the presence of an incorporated city. Medford v. Jackson Cty., 2 Or. LUBA 387, 390 n 2 (1981), aff'd in part, remanded in part 57 Or.App. 155, 643 P.2d 1353 (1982). LCDC argues that a "reasons" exception to Goal 14 is not required for areas "built" or "committed" to "quasi-urban" uses, but is required for areas involving "new urban development" outside UGBs. We agree. However, one cannot conclude that areas have been "built" or "committed" to "quasi-urban" uses until a local government has undertaken the analysis necessary to take "built" or "committed" exceptions to Goal 14.[32] The taking of an exception to Goal *303 14, whether of the "built," "committed," or "reasons" type, determines that land is "suitable, necessary, or intended for urban use" and takes it out of the definition of "part (b)" rural land. Once land has been identified as "rural land" by the establishment of a UGB which does not contain that land, see Goal 14, it ceases to be "rural land" only after it has been made the subject of an exception to Goal 14.
Because the county has not undertaken the analysis necessary to take any exceptions to Goal 14, Part III.B., supra, we cannot agree with LCDC that the exceptions areas are "quasi-urban" land which the county is entitled to infill without taking further exceptions. All of the land in the county outside the three cities' UGBs remains "rural land" because LCDC did not find in its decision that the county has shown that the land is "built" or "committed" to "quasi-urban" uses.
2. Conversion
The county argues that no exceptions to Goal 14 are necessary, because its Goal 3 and 4 exceptions areas do not convert "rural land" to "urban uses," but merely recognize existing development. This argument misunderstands "built" and "committed" exceptions as well as the policy of Goal 14.
In saying that both "built" and "committed" exceptions recognize existing development, the county disregards an important difference between the two. "Built" exceptions recognize what already exists on the parcels for which exception is taken. "Committed" exceptions require an analysis of how existing development on some parcels affects practicable uses of others and "must be based on facts illustrating how past development has cast a mold for future uses." See Halvorson v. Lincoln County, No. 84-099 (Or. LUBA July 19, 1985), slip op. at 8. By definition, a "built" exception does not change the existing use, but a "committed" exception does permit the use to be changed as provided for in the actual zoning of the parcel. In claiming that its "committed" exceptions areas only allow development which already exists, the county overlooks both the general nature of "committed" exceptions and its own statement in the Committed Lands Document that "committed lands include some vacant lands which could provide areas for residential infill with future development." (Emphasis added).
We hold, moreover, that any decision which allows "urban uses" of "rural land" converts that land and must comply with or take exception to Goal 14, even if that decision does not change the use of the land. The statutory provision for "built" exceptions, ORS 197.732(1)(a), and the policy of Goal 14 require this conclusion. By providing for "built" exceptions, the legislature decided that local governments may not simply recognize informally uses which do not conform to goal requirements. The city or county must inventory existing uses to identify which actually conflict with the goals, officially authorize these uses, and publicly articulate its reasons for legitimizing them. This is not an empty formality, but a rational process that requires local governments to characterize existing development and consider its effects upon practicable and desirable uses of neighboring land. The "orderly and efficient transition from rural to urban land use" which Goal 14 is intended to effect cannot occur if a local government does not determine and state at the outset which areas outside of UGBs already contain "urban" (or "quasi-urban") uses.

3. Urban uses

Exceptions to Goal 14 are required if the uses to which the county authorized conversion *304 of its "rural land" were "urban." We have recognized that because "urban uses" derives its significance from the presence of that phrase in a goal adopted by LCDC, we would give "some deference" to any decision by LCDC concerning the meaning and application of this phrase. Supra, 301 Or. at 469, 724 P.2d 284. However, LCDC decided this case without considering whether the particular uses allowed by this county's plan were "urban uses," and we find in the other materials cited by the parties no definitive interpretation of that term enabling us to decide whether a plan allows "urban uses" in cases where LCDC has not addressed the issue.
1000 Friends argues, see Part II.B., supra, that the overall effect of the exceptions areas is to allow "urban uses," also pointing to specific areas where it believes the uses allowed by the county's zoning are "urban." The Agness Rural Community, a 491-acre area where the Illinois River joins the Rogue, is surrounded by the Siskiyou National Forest. It has 27 homes, "several resorts," a recreational vehicle park, a motel, a store, a restaurant, a library, a post office, a grade school, and a volunteer fire department, but it lacks public water and sewer systems. 1000 Friends complains that Agness now has an average parcel size of 19 acres, but the county has zoned 30 to 40 percent of the area for Rural Residential, one-acre minimum lot size, and another 40 percent for "Community Commercial" use.
Pistol River Central has 65 acres presently divided into eight parcels under six ownerships, 55 of those acres in parcels of at least nine acres, and houses on only two parcels, one of 13 and the other of two acres. 1000 Friends complains that the county has zoned the entire area for Rural Residential, five-acre minimum lot size, which would allow a six-fold increase in residential density.
Other residential areas of which 1000 Friends complains are Elk River/Swinging Bridge (zoned 2.5-acre minimum) and Hubbard Creek (5-acre minimum), in which the county's zoning would allow populations to quadruple.
1000 Friends also says that the county's Planned Unit Development ordinance allows "apparently unlimited densities" in exceptions areas and that the more than 1,100 acres of commercial and industrial lands, for which the county took no exceptions to any goal, would be "urban."
1000 Friends has undoubtedly chosen what it considers the clearest examples of "urban uses" which the county's plan would allow in the exceptions areas, but we understand 1000 Friends to argue that these examples are representative. 1000 Friends does not indicate in how many areas it believes the county would allow similar intensification of development. The Committed Lands Document shows that many exceptions areas have core areas of from one-third to one-half of their land already developed at about the parcel sizes allowed by the county's zoning, but also have much larger, mostly undeveloped, parcels on their peripheries, which border on even larger and less developed parcels immediately outside the exceptions areas. It is clear that in these areas, the county's zoning allows for substantially greater residential densities than now exist.
It is not clear, however, whether those greater densities would be "urban." As we have already emphasized, the definitions that accompany the goals do not define "urban uses." They do say that "urban land" may have "concentrations of persons who generally reside and work in the area" and "supporting public facilities and services," but this does not tell us what degree of concentration, measured by what standard, makes uses "urban." Similarly, while OAR 660-14-030(3) lists criteria to be addressed in deciding "that land is committed to urban levels of development"
"(a) Size and extent of commercial and industrial uses;
"(b) Location, number and density of residential dwellings;

*305 "(c) Location of urban levels of facilities and services; including at least public water and sewer facilities; and
"(d) Parcel sizes and ownership patterns."
these criteria themselves do not say at what "size," "extent," "number," "density" or "ownership pattern" the line between urban and non-urban is to be found. Only the provision that "urban levels of facilities" exist only where there is "at least public water and sewer facilities" suggests such a line.
Even so, before this court all three parties make an effort to fill the definitional gap. 1000 Friends argues from past LCDC and LUBA cases which have defined urban uses "in bits and pieces, but not consistently," that the uses authorized by the county's plan are "urban." The county, selecting differently from the same cases, maintains that to the extent the existing uses are not already "urban," its plan does not make them "urban," either. LCDC says that "what is urban will depend greatly on the locale and the factual situation at a specific site," that in this factual situation the uses are "quasi-urban" and that, therefore, the "equivalency of and exception to Goal 14" has resulted.[33]
LCDC and LUBA decisions indicate that parcel sizes at either extreme are clearly urban or non-urban, but establish no bright line in the range presented by this county's exceptions areasone-acre to five-acre minimums. We accept the concessions of 1000 Friends that residential density of one house per ten acres is generally "not an urban intensity," and of LCDC that areas of "half-acre residential lots to be served by community water and sewer" are "urban-type." We find no decisions which had trouble classifying lands at these extremes.[34] However, absent an authoritative interpretation from LCDC so stating, it is not for us to generalize, as Metro suggests, that any development which requires a sewer system, "usually * * * development of more than one unit per acre" is "urban," or as 1000 Friends urges, that any zoning at densities above one dwelling per three acres is "urban." Metro and the county persuasively identify sewer service as an important indicator of urbanization but cite no authority to prove that it should be conclusive; in any event, this record contains no finding about what residential density requires a sewer system under the particular conditions in Curry County. 1000 Friends' three-acre rule proposes a larger lot size than LCDC and LUBA have considered as possibly urban in most cases; it also makes no allowance for considering other factors which LCDC and LUBA have treated as important, such as the size of the area, its proximity to acknowledged UGBs, and the types and levels of services which must be provided to it.[35] LCDC's *306 lawyer stated at oral argument that "because of the varying density of urban fabric you'll find in the State of Oregon, * * * it's virtually impossible to draw a line and say, one-acre lots are urban, two-acre lots are rural." If that correctly states the agency's position, it is clear that LCDC is not prepared to draw a bright urban/rural line based on parcel size alone.
LCDC's staff report and acknowledgment order do not state, and the record contains no findings which indicate, whether the uses to be allowed in the residential exceptions areas are "urban." In several cases, n. 35, supra, LUBA and LCDC have considered one-acre lots potentially "urban" and have indicated that larger lots may also be considered "urban" if they are close to a UGB or would require extension of certain services. The concern is that UGBs mean little if similarly-sized, similarly-served lots are as readily available just outside the UGBs as within them. The county says that only eight of its exceptions areas touch the UGBs. Perhaps cross-referencing between the Committed Lands Document and the zoning maps would reveal how many acres are zoned for which densities within certain distances from the three UGBs in the county. That information would still not indicate how those densities compare with those allowed just within the UGBs or what services might have to be provided.
The task of compiling and analyzing such data to determine its significance (if any) for identifying "urban uses" is not for this court. Even if we were presented with the data, we would be wrong to decide whether the uses are "urban" without analysis of the issue by the county, which is best situated to describe its authorized uses, and by LCDC, which itself adopted the goal that employs the term "urban uses" and thus has the responsibility for developing consistent policies for evaluating what "urban uses" means in different contexts. For example, if the county presented information comparing the proposed development with that within the UGBs, LCDC might resolve the "urban uses" question in the manner suggested in one LUBA opinion by asking if the uses are "of a kind and intensity characteristic of urban development" in nearby cities.[36] LCDC might instead decide that certain commercial and industrial uses, residential densities, levels of facilities, and parcel sizes are per se "urban uses" statewide. In this case, the county's planning documents, the staff report, and the acknowledgment order are silent on the issue with respect to the exceptions areas.
Similarly, the county and LCDC do not discuss whether the commercial and industrial uses proposed by the county outside the UGB are "urban." In past cases, LUBA and LCDC have implied that rural commercial and industrial development present as serious a threat to the policies of Goal 14 as do rural residences.[37] LUBA *307 has said that among the factors considered in determining if a particular use is urban are whether it is "appropriate for, but limited to, the needs and requirements of the rural area to be served," and whether it is likely to become a "magnet" attracting people from outside the rural area. Conarow v. Coos County, 2 Or. LUBA 190, 193 and n. 4 (1981). Although the Comprehensive Plan characterizes the county's rural commercial and industrial lands as "lands which are presently committed to such use and some vacant lands that were previously in commercial or industrial use or are needed for future development * * *," the Committed Lands Document does not include, identify, or analyze these lands. The plan lists three commercial zones allowing differing levels of use, but does not indicate how much of the existing and future commercial lands are zoned "Heavy Commercial," the highest level of these. Nor does it indicate how much of the existing and future industrial uses might be of "urban" intensity. Even had LCDC considered this issue, it would have had little to go on.
The county, however, contends that to the extent development in the exceptions areas is not already "urban," the plan restricts provision of public facilities and services to these areas and so prevents them from becoming "urban." Goal 11, Guideline A.2, states:
"Public facilities and services for rural areas should be provided at levels appropriate for rural use only and should not support urban uses."
LUBA and LCDC decisions have concluded that this guideline prohibits provision of urban levels of services to rural areas. Conarow v. Coos County, 2 Or. LUBA 190, 193 (1981); Sandy v. Clackamas Cty., 3 LCDC 139, 148 (1979). The county says it "has placed considerable reliance upon Goal 11 regulation of rural and urban development in its plan and zoning ordinance," and that conversion of "rural land" to "urban uses" "was not possible in Curry County because of the Goal 11 restrictions on extra-UGB public facilities and services * * * (urban public facilities and services are prohibited outside UGBs)."
LCDC made no findings to the effect, and we cannot conclude, that the plan's "Goal 11 restrictions" as a matter of law prohibit "urban uses" in the county's exceptions areas. First, the restrictions on urban facilities in the areas are not absolute. The Goal 11 guideline uses the verb "should" rather than the mandatory "shall." The county says it "recognizes the rural areas of the county as being a rural service area and does not encourage the provision of additional public services into these areas in order to preserve their rural character." (Emphasis added.) The Committed Lands Document does not give the zoning of the exceptions areas, and while the data sheets for each area indicate the existing "Transportation and Public Facilities" and the number of "Additional Dwelling Units Possible," they do not say what burden the additional units will put on existing services. For many areas, the "Transportation and Public Facilities" section does not say whether or not some services (e.g., water, police, and fire protection) discussed for other areas exist. There is no assurance that the exceptions areas will not demand, and be provided with, new "urban" level services.
Second, the county does not clearly define what it considers to be the line between "urban" and "rural" levels of services. At one point, the county offers these broad, inclusive definitions:
"Rural Facilities and Services-are facilities and services which the governing body determines to be suitable and appropriate *308 solely for the needs of rural use.
"Urban Facilities and Services-are key facilities which are at least the following: police protection, fire protection, sanitary, storm drainage facilities, planning, zoning, and subdivision control, health services, recreation facilities, energy and communication services, and community government services."
At another point, however, it seems to distinguish the two mostly by availability of community water and sewers:
"Rural service levels are generally considered to be the provision of protective services (police and fire), electrical power, communication services and education.
"Urban level services are generally determined to be all of those services found in rural areas and also the provision of public water and sewage disposal * * *. The comprehensive plan recognizes the following public facility service areas in the county:
"(1) Rural service areas-basic protective services, energy and communication services and education available, water and sewage disposal on individual bases.
"(2) Rural community service areas-all services that exist in rural areas and also a public water system together with a commercial center (store, post office, church, etc.)
"(3) Urban service areas-all services that exist in the above service areas and also sewage disposal. These areas are located within the [UGBs] * * *."
The county's shifting definitions further weaken the assurance that no "urban uses" will occur in the exceptions areas.
Third, the actual zoning does not necessarily correspond to the levels of service which the county has identified as existing or appropriate. The plan says that "[p]lan designations and zoning have been applied to lands within the county that are appropriate to the identified service levels"; the three rural residential zones are five-acre minimum "where lands are presently parcelized at that size and water availability is uncertain," 2.5-acre minimum where lands are parcelized at that size and "water availability is known to some extent," and one-acre minimum "where lands are highly parcelized and public or community water is available or approved individual wells exist on each lot proposed in a division of land." For 17 exceptions areas, however, the data sheets say nothing about available water, and few, if any, sheets mention "approved individual wells." Perhaps we should assume that in these areas no public water is available, but for many other areas the county expressly says so when this is the case. For some areas where the county does discuss water availability, the zoning is inconsistent with the plan's generalizations. On the one hand, the county zones three areas on the lower Rogue River for one-acre minimum rural residences, although the data sheet for one (Pedro Gulch/Squaw Valley Junction) says no public water is available, for the second (Jerry's Flat/Saunders Creek) does not mention water availability, and for the third (Jerry's Flat/Vista Loop) says that "[p]ublic water is available from the City of Gold Beach water main at the county road."[38] On the other hand, it zones for 2.5-acre minimums three areas near the Chetco River (Pleasant Hills, Tiderock, and Van Pelt Addition) which are already served by public water. Moreover, in two areas (McVay Creek and Lower Winchuck) the county has taken exceptions for areas where public water is now being extended to alleviate health hazards caused by contaminated water supplies, noting for each area that numerous "additional dwelling units" are "possible." The county, in short, does not consistently use either the level of existing services or existing residential density *309 as a reliable "governor" of urbanization outside the UGBs.
We do not hold that a plan's Goal 11 restrictions on extension of services can never serve as an adequate assurance that development on "rural land" will not become "urban uses." For example, a county could, in its plan, strictly prohibit provision of particular services to certain areas and types of "rural land"; it could also explain in its exceptions documents why the uses proposed would not require "urban" levels of services. This county's plan does neither.
Absent discussion by LCDC whether the county's plan would allow "urban uses" in the exceptions areas, we decline the county's invitation to hold that the plan does not convert "rural land" to "urban uses" (and therefore that exceptions to Goal 14 could not have been required). Because LCDC did not do the analysis necessary to determine whether the county's plan would allow the conversion of "rural land" to "urban uses," neither the Court of Appeals nor this court could be in a position to decide whether the county should have taken exceptions to Goal 14. LCDC's disposition of 1000 Friends' Goal 14 objection "erroneously interpreted a provision of law," ORS 183.482(8)(a), because it is impossible "[t]o provide for an orderly and efficient transition from rural to urban land use," Goal 14, when the county and LCDC fail to do what is necessary to determine whether such a transition is taking place. Moreover, "a correct interpretation" of Goal 14 "compels a particular action," ORS 183.482(8)(a): LCDC must determine whether the county's exceptions areas allow "urban uses." We must remand this case to LCDC so that it may do this analysis that the correct interpretation of Goal 14 requires.
IV. Were the Exceptions to Goals 3 and 4 Valid Under Goal 2?
The Court of Appeals declined to decide whether the underlying exceptions to Goals 3 and 4 comply with the requirements of Goal 2 and ORS 197.732. Although we granted review primarily to determine when exceptions must be taken to Goal 14, and the parties gave little emphasis to the Goal 2 issue in their written submissions and in oral argument, the validity of the exceptions to Goals 3 and 4 is important. For the exceptions that were valid, LCDC may properly (1) acknowledge every exceptions area in which it determines that the county is not proposing urban uses; and (2) assume for the areas in which the county's plan allows "urban uses" that impracticability of resource use (part (a) rural use) but not yet of other, Part (b) rural uses, has already been shown. For the exceptions that were invalid, LCDC must require the county to begin anew to justify all the exceptions areas, whether or not the county proposes urban uses.

A. Issues Properly Before Us

1. The County's Exceptions Criteria

The Court of Appeals erred in holding that the county's exceptions criteria need not be evaluated for conflicts with the state standards because the criteria have "no legal effect." 73 Or.App. at 352, 698 P.2d 1027.
We agree that the criteria cannot be given any legal effect in the future, for statutes now provide that exceptions are treated either as comprehensive plan provisions (before acknowledgment) or as plan amendments (after acknowledgment), and that all plan provisions and amendments must comply with the goals. ORS 197.732(8), 197.250, 197.835(4). Therefore, the county must consider the goals, not the criteria in its own plan, both in justifying any exceptions it chooses to take on remand of this case and in taking post-acknowledgment exceptions. Whatever the Committed Lands Document says about the use of the county's own criteria to take the present exceptions to Goals 3 and 4, future exceptions are controlled by ORS 197.732, Goal 2, Part II, and OAR chapter 660. Any LCDC order finally acknowledging the county's plan must make clear (as the 1984 acknowledgment order did not) that LCDC does not acknowledge the county's criteria *310 as a proper basis for taking future exceptions.
However, even though the criteria cannot be used to justify future exceptions, they are still important because the county actually used them to justify the exceptions presently before us. If the criteria omitted factors that the goals and administrative rules required to be taken into account, or included factors that should have been irrelevant, all of the exceptions could have been flawed. Thus, we must examine whether the use of these criteria resulted in deficient justifications for the exceptions.

2. 1000 Friends' Other Objections

We also disagree with the Court of Appeals that 1000 Friends presented its objections to specific exceptions areas too "incoherent[ly]" to warrant judicial review. See 73 Or.App. at 352, 698 P.2d 1027.
Like the Court of Appeals, we are frustrated that 1000 Friends' precise basis for objecting to each part of each exceptions area is not clear. Nevertheless, 1000 Friends argues persuasively that appellate briefs would become interminable if objectors were required to detail every objection regarding every piece of land.
Moreover, the question before LCDC is not whether an objector has met some burden of going forward with or proving an objection to the plan, but whether the record made shows that the local government has complied with the land use laws, including the goals. We recognized in Fish and Wildlife Department v. LCDC, 288 Or. 203, 212-13, 603 P.2d 1371 (1979), that "LCDC is not in the position of an appellate court whose primary duty is deciding competing interests of litigants but, rather, it is an agency of government charged with monitoring land use decisions of other governmental bodies to make sure established standards are met." The statutes requiring local government planning to comply with the goals, ORS 197.175, and providing for LCDC acknowledgment of plans, ORS 197.251, support the allocation of burdens described by Judge Gillette:
"LCDC, in responding to 1000 Friends' objections to these areas, apparently placed the burden on 1000 Friends to show that the areas are not committed. That is improper. LCDC's role is to use all the information available, including that presented in objections, to make its independent determination of whether the county has shown that the exceptions are justified. LCDC should evaluate the strength of the county's case, not the weakness of the objector's."
1000 Friends of Oregon v. LCDC [Jefferson County], 69 Or.App. 717, 729 n. 12, 688 P.2d 103 (1984). On appeal, the objector's burden of going forward can be limited to stating the factual and legal grounds for its objections and demonstrating that it developed a basis for these in the record before LCDC.
Here, 1000 Friends' brief to the Court of Appeals referred to portions of the administrative record that listed the exceptions areas to which it objected and indicated the following factual and legal arguments, for each of which it had developed a record:
(1) The county's exceptions criteria "give improper weight to parcelization, which should not be considered independently from actual use of the land."
(2) The county does not define "development," a term used in several of the criteria.
(3) The criteria do not require precise statements why existing services irrevocably commit lands to nonresource use.
(4) The county should not have taken "built" and "committed" exceptions to Goal 3 for lands that were "actually in [commercial lily bulb] farm use" when the exceptions were taken, because it cannot be "impossible" or "impracticable" to farm land that is actually being used for farming.
(5) The county should not have included "large, apparently vacant parcels on the periphery" of the Rural Communities in its "committed" exceptions.
The first three grounds for objection went to the underlying basis for all the exceptions. *311 As to the fourth and fifth grounds, 1000 Friends specified both in its objection letter in the record and in its brief examples of areas where the alleged deficiencies existed.
1000 Friends met its burden as objector because it (1) placed in the record a complete list of the exceptions areas to which it objected; (2) described the types of factual and legal deficiencies upon which it based the objections; and (3) gave examples of areas where each type of deficiency allegedly existed. An objector who does these things gives the local government a sufficient opportunity to respond, gives LCDC an opportunity to resolve the issues, and, if it summarizes the arguments and cites to the record on appeal, gives the court a basis for identifying and resolving contested issues. A court which demands that objectors do more before it will consider their arguments imposes an improper burden on objectors and, more importantly, implies that LCDC can disregard its duty to "make its independent determination" of a local government's compliance as to all portions of a plan which objectors do not contest. See Jefferson County, supra, 69 Or. App. at 729 n. 12, 688 P.2d 103. We consider 1000 Friends' Goal 2 objections as sufficiently presented.

B. The Merits

1. The Exceptions Criteria
Although the county's criteria did not precisely track the language of the factors in LCDC's "committed" exceptions rule that was in effect in 1982, former OAR 660-04-025(3),[39] LCDC's 1982 staff report stated that the criteria were "consistent" with those factors. The table in LCDC's brief in the Court of Appeals convinces us that each of the factors in the LCDC rule was addressed somewhere in the county's criteria and/or its data sheets. Moreover, any "one or more" of the factors in former OAR 660-04-025(3) could serve as the basis for each exception. Former OAR 660-04-025(4).
However, the 1982 staff report and the briefs of both the county and LCDC neglected to consider that former OAR 660-04-025(5) and (6) spelled out more specific matter for local governments to take into account if the local governments relied on one particular factor, "Parcel size and ownership patterns," as the basis for exception:
"(5) Consideration of parcel size and ownership patterns shall include how the existing development pattern came about and whether findings against the goals were made at the time of partitioning or subdivision. Past land divisions made without application of the goals shall not be used to demonstrate commitment of the divided land unless development on the resulting parcels prevents their resource use or the resource use of nearby lands. Farm and nonfarm parcels created pursuant to goal 3 and EFU zoning provisions shall not be used to justify a built or committed exception.
"(6) Existing parcel sizes and their ownership shall be considered together in relation to the land's actual use. For example, several contiguous undeveloped parcels (including parcels separated only by a road or highway) under *312 one ownership shall be considered only as one farm. The mere fact that small parcels exist does not alone constitute commitment. Whether small parcels in separate ownerships are irrevocably committed will depend on whether the parcels stand alone or are clustered in a large group, and the location of the parcels relative to designated resource land." (Emphasis added.)
These provisions, maintained in substance in the present "committed" exceptions rule,[40] indicate an intent to recognize parcelization itself as sufficient justification for commitment only (1) when it (a) results from proper application of the planning goals, (b) results in parcels that cannot be used together because adjacent ones are in different ownership, and (c) actually affects the present practicable uses of the land; or (2) when the type of development on the parcels actually prevents resource use.
The county's exceptions criteria and data sheets generally failed to consider those additional matters in their discussion of parcelization. Neither the criteria nor the data sheet format requires any consideration of how the parcelization came about, and in fact few, if any, data sheets say whether the goals were considered when the parcels were created. The county omitted consideration of matters which the administrative rule requires, as the Court of Appeals has correctly observed, "to determine if future development is the unavoidable result of the * * * area's growth or whether it will continue previous patterns which themselves developed contrary to the goals." Jefferson County, supra, 69 Or. App. at 728, 688 P.2d 103. The maps accompanying the data sheets have symbols indicating common ownership, but the criteria do not indicate ownership as a factor affecting commitment; the format does not have any space for it to be, or require it to be, considered; and few, if any, data sheets in fact consider how common ownerships of adjacent parcels affect practicable uses. The county appears to consider parcels "developed" if they have residences of any kind so that the criteria allow parcels actually in farm or forest use to be considered "developed" simply because they have residences. (One exceptions criterion states that "[d]eveloped parcels of ten to thirty acres are included in a committed area if bordered on at least two sides by smaller developed parcels.") Based on its criteria, the county, contrary to the "committed" exceptions rule, could find areas "committed" based simply on the small size of parcels bordering the areas and/or the presence of residences. In several instances, the county's "Evaluation Comments" stating the ultimate justification for exceptions in fact relied on nothing more than those two factors to find commitment of quite large parcels.[41] In others, the only additional justifications are matters that neither the rule nor the county's own criteria make relevant to determining commitment, such as the mere presence of a road bordering the parcel.[42]
Because LCDC acknowledged exceptions areas based on justifications that did not address the matters in former OAR 660-04-025(5) and (6), its exercise of discretion was "[i]nconsistent with an agency rule" and this part of its order must be remanded. ORS 183.482(8)(b)(B). On remand, LCDC should review the "Evaluation Comments" to determine which exceptions were justified only by parcelization. Before acknowledging any of those exceptions, LCDC must determine, based either upon the factors listed in OAR 660-04-028(2)(c)(A) and (B) (how parcels came about, ownerships, actual uses, type of "development" *313 existing) or upon the factors other than parcelization listed in OAR 660-04-028(2)(a) and (b) (existing adjacent uses, public facilities and services), that the county's findings and reasons demonstrate that the pertinent resource use is impracticable. ORS 197.732(6)(b) and (c).
2. Validity of Particular Exceptions
We confine our review here to the objections 1000 Friends articulated in its appellate brief: that "farm use" should not be found impracticable on lands actually being farmed and that large, undeveloped parcels on peripheries should not have been included in Rural Communities exceptions areas.
The record shows that LCDC did not consider the first objection. In the 1984 proceedings, 1000 Friends presented the argument and the photographs purporting to show that land in some exceptions areas was actually in resource use. The 1984 staff report characterized 1000 Friends as "reiterat[ing]" objections made in 1982, "formerly addressed" by LCDC, and not upheld in 1982. However, the objection about land actually in resource use had not even been before LCDC in 1982. By lumping this ground of objection with grounds already rejected, LCDC failed to address its merits.
If land is actually in a use allowed by a resource goal, the county ought to make findings and state reasons, and LCDC should clearly state the reasons why "existing adjacent uses and other relevant factors" nevertheless "make uses allowed by the applicable goal impracticable," to justify a "committed" exception to a resource goal for that land under ORS 197.732(1)(b). See ORS 197.732(4), (6)(c). We agree with LCDC that the former "not possible" and the present "impracticable" standard are not the same. A May 27, 1983 memorandum to the Senate Committee on Environment and Energy stated that the drafters intended "the terms `irrevocably committed' be interpreted by [LCDC] to avoid any Court interpretations which would define this phrase in absolute terms." Nevertheless, the instances where existing resource uses cannot practicably be continued, and the reasons why, must be explained by the local government and evaluated by LCDC.
The county concedes that "[f]arm use parcels were necessarily included within the committed area through application of [the county's exceptions] criteria." It argues that its inclusion of these parcels is justified because they are part of the Harbor Bench Farm District, said to be the product of "a unique management concept," which overlays several exceptions areas and "protects the valuable * * * resource land in spite of adjacent residential/commercial development and in spite of high intensity farming impact upon this existing development." The county maintains that the zoning for resource lands in the District is "identical" to exclusive "farm use" zoning and that the designation of the District allows planning decisions to be made "on an integral basis with regard to the agricultural capability of the area." Whatever the merits of the farm district management concept, however, ORS 197.732(1)(b) does not permit the county to implement it by taking exceptions to Goals 3 and 4 for land on which farm use is still practicable.[43]
On remand, LCDC must determine which parcels in the areas objected to and photographed by 1000 Friends are actually in "farm use."[44] LCDC may not acknowledge exceptions areas which include parcels in farm use unless it finds that the record shows why existing adjacent uses *314 and other relevant factors (as described by LCDC's rule for "committed" exceptions) make "farm use" impracticable.
In 1982, LCDC sustained the objection to the Rural Communities, specifying that the county should provide more information about the large peripheral parcels. After the county submitted amendments in 1984, LCDC acknowledged the exceptions for the Rural Communities, citing for Langlois, Ophir, and Nesika Beach factors such as topography limiting practical resource use, development of parcels with multiple dwellings, natural features buffering parcels from adjacent resource lands, and complete surrounding of parcels by small parcels developed for uses incompatible with resource use. There is substantial evidence in the record for each fact upon which LCDC relied in citing those factors, and the factors cited are all recognized in the "committed" exceptions rule, OAR 660-04-028(2). LCDC noted that Agness is within a federal- and state-designated wild and scenic river area, where commercial forest practices would cause serious conflicts with the purposes of that designation. The record contains substantial evidence supporting that finding, and this was a proper "other relevant factor" upon which the county and LCDC could rely in concluding that resource use is impracticable. OAR 660-04-028(2)(g).
Unlike the situation for some "committed" areas, the findings that resource use was impracticable in the Rural Communities relied on more than mere parcelization. As to the exceptions to Goals 3 and 4 for these areas, LCDC's findings were "supported by substantial evidence in the record," ORS 183.482(8)(c), and LCDC acted consistently with its own rules in considering the factors that it did. We affirm LCDC's acknowledgment of the Rural Communities exceptions to Goals 3 and 4.

V. Conclusion

Our function is not to decide the details of land use planning controversies, but to resolve major doubts over the legal principles governing the planning system, to clarify how local governments and LCDC are to comply with the planning laws. The core of the local governments' role consists of identifying which goals pertain to which land, then deciding whether to plan for uses which comply with the goals or to take proper exceptions to permit other uses. The inclusion of Goal 14 among the goals requires local governments to determine which existing uses are "urban", to identify areas where the plan might convert "rural land" to "urban uses," and to justify those "urban uses"; it requires LCDC to evaluate whether the local government has made those determinations properly and has considered the proper factors in justifying any development that is "urban."
Although we have treated 1000 Friends' objections to the county's plan as sufficient for judicial review of important legal issues, they must now be made more specific, so that LCDC may consider the individual exceptions areas on remand. It is not clear from 1000 Friends' objection letters, briefs, petition, and memoranda precisely which areas it objected to only on Goal 2 grounds (exceptions to Goals 3 and 4 not justified), which only on Goal 14 grounds ("urban uses" improperly authorized), and which on both.
Where the development allowed by the county's plan outside the UGBs includes "urban uses," the county's plan converts "rural land" to "urban uses" which will have to be supported by changes in the UGBs or by exceptions to Goal 14. On remand, 1000 Friends should identify the portions of the exceptions areas in which it claims that the uses allowed by the county's plan are "urban"; the county should then either explain why it believes the uses allowed are not "urban," or, if they are "urban," make a record to demonstrate, as is required by ORS 197.732(4), that the standard for "committed" exceptions to Goal 14 have been met (that is, that it is impracticable to allow any rural uses). Of course, the county may choose instead to seek "reasons" exceptions to Goal 14, pursuant to ORS 197.732(1)(c), for any areas in which it concedes its zoning would allow "urban uses," but on which it believes it cannot prove impracticability of rural use.
*315 Before acknowledging that the plan complies with the goals, LCDC must determine that the plan allows no "urban uses" outside the UGBs which are not supported by exceptions to Goal 14. To make that determination, LCDC must enter findings based upon the record before it, stating in which (if any) of the exceptions areas the plan allows "urban uses." See ORS 197.251(5). For any such areas, LCDC, bound by the county's findings for which there is substantial evidence in the record, must clearly state the reasons why the standards for "built," "committed," or "reasons" exceptions to Goal 14 have been met. ORS 197.732(1), (5). "Committed" exceptions to Goal 14 must be supported by an explanation of why "existing adjacent uses" and "other relevant factors" described by OAR 660-14-030 make it impracticable to allow any rural uses. ORS 197.732(1)(b) and (6)(c). We reiterate that the interpretation of "urban uses" is primarily for LCDC, subject to judicial review only for consistency with the statutes authorizing LCDC to adopt the goals and with the policies of the goals themselves. LCDC, however, must develop some interpretation of "urban uses," either by formulating a general definition or by elaborating the meaning ad hoc from case to case. LCDC may even choose to address that issue and other definitional problems noted in this opinion by amending the goals, guidelines, or definitions in accordance with ORS 197.235 to 197.245, or by promulgating new or amended administrative rules, in accordance with ORS chapter 197 and ORS 183.325 to 183.410.
Because 1000 Friends objected to the exceptions criteria as a legally deficient basis for justifying all the Goal 3 and 4 exceptions areas, and we have held that the criteria were deficient, LCDC should not require 1000 Friends to identify the areas which the county justified only by the improper reliance on mere parcelization and unspecified "development." It is LCDC's responsibility to identify the basis for each exception and to acknowledge exceptions only for those areas as to which the county has made a legally sufficient showing that the pertinent resource uses are impracticable. LCDC must also determine which parcels in the challenged exceptions areas are in "farm use" and on which any such parcels, in light of that use, the county has shown that "farm use" is impracticable.
The Court of Appeals is reversed on its disposition of the Goal 14 issue (sixth assignment of error), and affirmed in part and reversed in part on its disposition of the Goal 2 issues (first and second assignments of error). The case is remanded to LCDC for further proceedings in accordance with this opinion.
PETERSON, Chief Justice, concurring.
I agree that a county must take an exception to Goal 14 in order to authorize an urban use outside a UGB, that the taking of exceptions to Goals 3 and 4 is not equivalent to the taking of an exception to Goal 14, that the county should have taken an exception to Goal 14 in authorizing uses which could be termed "urban uses" outside an existing UGB, and that the case must be remanded for the reasons stated in the majority opinion. I therefore concur in the result.
NOTES
[*] Roberts, J., retired February 7, 1986.
[1] By "urban uses" we refer to a term that LCDC employs in the text of Statewide Planning Goal 14 and in some of its published definitions of other terms, but which LCDC has not defined in the goals, the published definitions that apply to those goals, the Oregon Administrative Rules, or any other source of which we are aware. We shall refer to this lack of a definition, Part I.B., infra, 301 Or. at 456, 724 P.2d 277, note the necessity of having a working definition of "urban uses" before resolving the questions which the parties have presented in this case, Part III, infra, 301 Or. at 469-470, 724 P.2d 284 and elaborate on the consequences of LCDC's failure to examine whether this county's plan allows "urban uses." Parts III.C.3, and V, infra, 301 Or. at 511, 520-522, 724 P.2d 309, 314-315.
[2] See, e.g., Ota, Legal Designations Bog Down Hearing, The Oregonian, Nov. 12, 1985 at B4 (discussing this case); Oregon Land Use Symposium: Closing RemarksThe Oregon Example: A Prospect for the Nation, 14 Envtl.L. 843, 849 (1984) (remarks of Edward J. Sullivan) ("The lack of information helps the small cabal of planners and lawyers, including myself, who keep a watch on [LCDC] and [the Land Use Board of Appeals], but it does not help the general public or the lawyer or the planning practitioner."); Cockle, Rural Coalition Declares Range War on LCDC, The Oregonian, Nov. 17, 1985, at El, E4.
[3] ORS 197.005 provides:

"The Legislative Assembly finds that:
"(1) Uncoordinated use of lands within this state threaten the orderly development, the environment of this state and the health, safety, order, convenience, prosperity and welfare of the people of this state.
"(2) To promote coordinated administration of land uses consistent with comprehensive plans adopted throughout the state, it is necessary to establish a process for the review of state agency, city, county and special district land conservation and development plans for compliance with goals.
"(3) Except as otherwise provided in subsection (4) of this section, cities and counties should remain as the agencies to consider, promote and manage the local aspects of land conservation and development for the best interests of the people within their jurisdictions.
"(4) The promotion of coordinated state-wide land conservation and development requires the creation of a state-wide planning agency to prescribe planning goals and objectives to be applied by state agencies, cities, counties and special districts throughout the state."
ORS 197.010 provides:
"The Legislative Assembly declares that, in order to assure the highest possible level of liveability in Oregon, it is necessary to provide for properly prepared and coordinated comprehensive plans for cities and counties, regional areas and the state as a whole. These comprehensive plans:
"(1) Must be adopted by the appropriate governing body at the local and state levels;
"(2) Are expressions of public policy in the form of policy statements, generalized maps and standards and guidelines;
"(3) Shall be the basis for more specific rules and land use regulations which implement the policies expressed through the comprehensive plans;
"(4) Shall be prepared to assure that all public actions are consistent and coordinated with the policies expressed through the comprehensive plans; and
"(5) Shall be regularly reviewed and, if necessary, amended to keep them consistent with the changing needs and desires of the public they are designed to serve."
[4] The goals are listed in OAR 660-15-000 to XXX-XX-XXX. As far as we know, however, the full text of the goals and guidelines as amended is available only in a tabloid publication of LCDC, Oregon's Statewide Planning Goals (1985), available from the Department of Land Conservation and Development, 1175 Court Street, N.E., Salem, Oregon 97310, telephone (503) 378-4926. Practitioners should, but may not necessarily, know that seven goals were amended in 1983 and 1984. (Indeed, at the time this case was argued, this court's own library contained only the pre-amendment versions of the goals.)
[5] Some major decisions, for example amendments and revisions of the comprehensive plan itself, must be made "in compliance with" the goals even after acknowledgment, ORS 197.175(2)(a), and are subject to review by the Land Use Board of Appeals for such compliance. ORS 197.835(4). See also the reasoning of the Court of Appeals in 1000 Friends of Oregon v. Jackson Co., 79 Or.App. 93, 97, 718 P.2d 753 (1986), rev. den. 301 Or. 445, 723 P.2d 325 (1986). ("All comprehensive plan amendments are reviewable under ORS 197.835(4) for compliance with the statewide goals." (Emphasis added.))

Although LCDC, on August 7, 1986, acknowledged the plans for the last two of Oregon's 277 counties and cities subject to the planning requirements, several plans are still on judicial review, and LCDC is expected to review about 3,000 "adjustments" to local comprehensive plans per year, including as many as 1,000 plan amendments on which it may have to file formal comments. See The Oregonian, Aug. 8, 1986, at D5.
[6] LCDC Policy Memorandum, Exceptions Process, approved Mar. 10, 1978, and amended May 3, 1979, p. 2. Other resource goals are Goal 16, "Estuarine Resources," Goal 17, "Coastal Shorelands," and Goal 18, "Beaches and Dunes." See Planning Goals, supra, n 4, at 16-21.
[7] We consider how the definitions of "urbanizable" and "rural" land apply to this case in Part III.C.1, infra. 301 Or. at 498-501, 724 P.2d 301-303.
[8] We consider the meaning of "conversion" of land in Part III.C.2, infra. 301 Or. at 501-502, 724 P.2d 304.
[9] Before amendment, Goal 2, Part II, provided:

"When, during the application of the statewide goals to plans, it appears that it is not possible to apply the appropriate goal to specific properties or situations, then each proposed exception to a goal shall be set forth during the plan preparation phases and also specifically noted in the notices of public hearing. The notices of hearing shall summarize the issues in an understandable and meaningful manner.
"If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the plan and shall include:
"(a) Why these other uses should be provided for;
"(b) What alternative locations within the area could be used for the proposed uses;
"(c) What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;
"(d) A finding that the proposed uses will be compatible with other adjacent uses."
[10] LCDC Policy Memorandum, supra, n 6, at 2.
[11] LCDC Policy Memorandum, supra, n 6, II. Common Questions Concerning the Exceptions Process as it Relates to Land Use Decisions Prior to an Acknowledged Comprehensive Plan (as amended May 3, 1979) at 1.
[12] ORS 197.732(1) provides:

"(1) A local government may adopt an exception to a goal when:
"(a) The land subject to the exception is physically developed to the extent that it is no longer available for uses allowed by the applicable goal;
"(b) The land subject to the exception is irrevocably committed as described by commission rule to uses not allowed by the applicable goal because existing adjacent uses and other relevant factors make uses allowed by the applicable goal impracticable; or
"(c) The following standards are met:
"(A) Reasons justify why the state policy embodied in the applicable goals should not apply;
"(B) Areas which do not require a new exception cannot reasonably accommodate the use;
"(C) The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and
"(D) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."
The corresponding provisions of Goal 2, Part II, are now identical. See Planning Goals at 4.
[13] Compare OAR 660-04-028 with OAR 660-14-030. We shall consider how these rules apply to the facts in Curry County in Part III.B.1 of this opinion. 301 Or. at 480-485, 724 P.2d 290-293.
[14] Where the parties have minor disagreements about exact numbers which seem unimportant in detail, we have more or less split the difference and approximated.
[15] Before LCDC and the Court of Appeals, 1000 Friends raised several other objections upon which it either prevailed or chose not to petition for our review. 1000 Friends of Oregon v. LCDC, 73 Or.App. 350, 354-56, 698 P.2d 1027 (1985) (third through fifth assignments of error).
[16] It is not clear from individual data sheets to which goals exceptions were being taken for each area; many speak generally of commitment to "non-resource" uses. While 1000 Friends objects to the county's failure to specify, it is not disputed that each exception was either to Goal 3, Goal 4, or both.
[17] The county's argument to the contrary is incorrect. It is true that ORS 197.251(13)(a)(C) now makes continuance orders final and therefore reviewable, ORS 183.480(1), as to any parts of the plan that are in compliance with all the goals. However, that provision did not take effect until August 9, 1983. Or.Laws 1983, ch. 827, §§ 5 and 61.
[18] In 1000 Friends of Oregon v. LCDC (Linn County), 78 Or.App. 270, 717 P.2d 149 (1986), the court explained what it had believed the issue to be in its decision in the case at bar. "The issue which we understood that we were deciding in our earlier opinion was whether a separate exception to Goal 14 was necessary to allow the same or substantially similar nonresource uses as those which were authorized by the exceptions to Goals 3 and 4 for the resource land in question." 78 Or.App. at 274, 717 P.2d 149. The court went on to explain that it did not believe that it faced a level of development more intensive than the existing development that had prompted the taking of exceptions in the first place. Id.
[19] E.g., Medford v. Jackson Cty, 2 Or.LUBA 387, 391 (1981) ("the decision to allow intensification of use outside an urban growth boundary on non-resource lands must not undermine the effectiveness of adjacent urban growth boundaries"), aff'd in part & remanded in relevant part, City of Medford v. Jackson County, 57 Or. App. 155, 161, 643 P.2d 1353 (1982) (noting with apparent approval LUBA's decision that "Goal 14 requires assessing the impact that industrial development outside urban growth boundaries would have on lands inside such boundaries"); Metropolitan Serv. Dist. v. Clackamas Cty, 2 Or. LUBA 300, 307-08 (1981) ("[W]e do believe the county should have included some facts and made a finding as to the effect of the approval of the developments on the urban growth boundary. Of particular interest to us is whether these developments would contribute to a kind of sprawl or leap frogging development that might undermine the effectiveness of an urban growth boundary enacted to contain intense development.").

See also 1000 Friends of Oregon v. Clackamas Cty, 3 Or.LUBA 316, 327 (1981) ("The creation of many small rural lots * * * may necessarily result in the provision of a substantial amount of housing outside the UGBhousing which may well attract people who otherwise would live within the regional UGB. The effect of this on the UGB's ability to control residential sprawl must be addressed by the county. * * * Petitioners' * * * assignments of error, insofar as they allege a violation of goal 14, are sustained."); Sandy v. Clackamas Cty., 3 LCDC 139, 149-50 (1979) ("If this development is allowed, then there may as well not be urban growth boundaries. [It] * * * `is a perfect example of how Goal 14 may, little by little, case-by-case, be rendered ineffective and useless in controlling urban sprawl.' According to the testimony, this development would seriously frustrate urban-level utilization of lands in Sandy. * * * Proof that rural development will injure a city is proof of a Goal 14 violation.").
[20] LUBA was established in 1979, see ORS 197.810, to review certain land use decisions "not includ[ing] those matters over which [LCDC] has review authority under ORS 197.005-187.455 * * *." ORS 197.825(2)(c). See generally ORS 197.805-197.855. Some questions of LUBA's jurisdiction are discussed in Wasco County Court, 299 Or. at 355-59, 703 P.2d 207, and Wright v. KECH-TV, 300 Or. 139, 707 P.2d 1232 (1985).
[21] Carmel Estates, Inc. v. LCDC, 66 Or.App. 113, 117 and n. 2, 672 P.2d 1245 (1983) (affirming LCDC's order to rezone 12-acre tract located outside UGB "for non-urban use" to correct violation of Goal 14); Patzkowsky v. Klamath County, 8 Or.LUBA 64, 71 (1983) (in case involving subdivision located 17 miles from the nearest UGB, stating the county's general obligation "to make findings on the applicability of Goal 14 when rural land is to be converted to small size lots"); Ashland v. Jackson Cty, 2 Or.LUBA 378, 382 (1981) ("It is our view that designation of a large area outside an urban growth boundary for urban-like or intensive uses is a violation of Goal 14"); Conarow v. Coos County, 2 Or.LUBA 190, 193-94 (1981) (neighborhood store "appropriate for and limited to the needs of the rural area in which it is proposed to be located" did not violate Goal 14, but "an urban use of land * * * must be included within an urban growth boundary to avoid violation of Goal 14") (emphasis added); Wright v. Marion County Board of Commissioners, 1 Or.LUBA 164, 170 (1980) ("Just as * * * the need for housing must be satisfied by land located within [a UGB], so must also the need for industrial uses be satisfied by land located within [a UGB]."); Sandy v. Clackamas Cty., 3 LCDC 139, 148 (1979) ("Rural land may not be put to urban level use. The only way to convert rural to urban land is to follow the Goal 14 process.").
[22] See nn. 10-11, supra.
[23] The Court of Appeals decided City of Medford v. Jackson County, supra, n. 19, on April 26, 1982.
[24] 1000 Friends of Oregon v. LCDC [Coos County], 75 Or.App. 199, 706 P.2d 987 (1985); 1000 Friends of Oregon v. LCDC [Jefferson County], 69 Or.App. 717, 688 P.2d 103 (1984); Still v. Board of County Comm'rs, 42 Or.App. 115, 600 P.2d 433 (1979).
[25] OAR 660-14-030 provides in part:

"* * * * *
"(2) A decision that land has been built upon at urban densities or irrevocably committed to an urban level of development depends on the situation at the specific site proposed for incorporation. The exact nature and extent of the areas found to be irrevocably committed to urban levels of development shall be clearly set forth in the justification for the exception. The area proposed for incorporation must be shown on a map or otherwise described and keyed to the appropriate findings of fact.
"* * * * *
"(5) Larger parcels or ownerships on the periphery of an area committed to urban densities may only be considered committed to urban development and included in the area proposed for incorporation if findings of fact demonstrate:
"(a) Urban levels of facilities are currently provided to the parcel; and
"(b) The parcel is irrevocably committed to nonresource use or is not resource land; and
"(c) The parcel can reasonably be developed for urban density uses considering topography, natural hazards or other constraints on site development.
"(6) More detailed findings and reasons must be provided to demonstrate that land is committed to urban development than would be if the land is currently built upon at urban densities. Land which cannot be shown to be built to urban densities or committed to urban development may not be included within the area proposed for incorporation, except as provided for in OAR 660-14-040." (Emphasis added.)
[26] OAR 660-14-030 provides in part:

"(1) A conclusion, supported by reasons and facts, that rural land is irrevocably committed to urban levels of development can satisfy the Goal 2 exceptions standard (e.g., that it is not appropriate to apply Goal 14's requirement prohibiting the establishment of urban uses on rural lands). If a conclusion that land is irrevocably committed to urban levels of development is supported, the four factors in Goal 2 and OAR 660-04-020(2) need not be addressed.
"* * * * *
"(3) A decision that land is committed to urban levels of development shall be based on findings of fact, supported by substantial evidence in the record of the local proceeding, that address the following:
"(a) Size and extent of commercial and industrial uses;
"(b) Location, number and density of residential dwellings;
"(c) Location of urban levels of facilities and services; including at least public water and sewer facilities; and
"(d) Parcel sizes and ownership patterns.
"(4) A conclusion that rural land is irrevocably committed to urban development shall be based on all of the factors listed in section (3) of this rule. The conclusion shall be supported by a statement of reasons explaining why the facts found support the conclusion that the land in question is committed to urban uses and urban level development rather than a rural level of development.
"* * * * *."
[27] OAR 660-05-010(5) provides that OAR chapter 660, division 4, governs exceptions to Goal 3, and OAR 660-06-015(1) provides the same for exceptions to Goal 4.
[28] OAR 660-04-028(2) and (3) provide:

"(2) Whether land has been irrevocably committed will depend upon the situation at the specific site and the areas adjacent to it. The exact nature and extent of the areas found to be irrevocably committed shall be clearly set forth in the justification for the exception, and those area(s) must be shown on a map or otherwise described and keyed to the appropriate findings of fact. The findings of fact shall address the following factors:
"(a) Existing adjacent uses;
"(b) Public facilities and services (water and sewer lines, etc.);
"(c) Parcel size and ownership patterns of the exceptions area and adjacent lands:
"(A) Consideration of parcel size and ownership patterns under subsection (2)(c) of this rule shall include an analysis of how the existing development pattern came about and whether findings against the Goals were made at the time of partitioning or subdivision. Past land divisions made without application of the Goals do not in themselves demonstrate irrevocable commitment of the divided land. Only if existing development on the resulting parcels or other factors prevent their resource use or the resource use of nearby lands can the parcels be considered to be irrevocably committed. Resource and nonresource parcels created pursuant to the applicable goals shall not be used to justify a committed exception.
"(B) Existing parcel sizes and their ownership shall be considered together in relation to the land's actual use. For example, several contiguous undeveloped parcels (including parcels separated only by a road or highway) under one ownership shall be considered only as one farm or forest operation. The mere fact that small parcels exist does not alone constitute irrevocable commitment. Small parcels in separate ownerships are more likely irrevocably committed if the parcels are developed, or clustered in a large group as opposed to standing alone or are not adjacent to or are buffered from designated resource land.
"(d) Neighborhood and regional characteristics;
"(e) Natural boundaries or other buffers separating the exception area from adjacent resource land;
"(f) Physical development according to OAR 660-04-025; and
"(g) Other relevant factors.
"(3) A conclusion that land is irrevocably committed to uses not allowed by the applicable Goal shall be based on one or more of the factors listed in section (2) of this rule. The conclusion shall be supported by a statement of reasons explaining why the facts support the conclusion that it is impracticable to apply the Goal to the particular situation or area." (Emphasis added.)
[29] LCDC appended to its Response to the Court's Questions two continuance orders and the acknowledgment order in that case, In the Matter of Clackamas County's Comprehensive Plan and Implementing Measures, 83-ACK-14 (LCDC Feb. 9, 1983), along with excerpts from the staff reports.
[30] See Cockle, Rural Coalition Declares Range War on LCDC, The Oregonian, November 17, 1985 at El. Cf. OAR 660-04-000(2) (" * * * The exceptions process is not to be used to indicate that a jurisdiction disagrees with a goal.").
[31] See Medford v. Jackson Cty, supra, n. 19, 2 Or.LUBA at 390-91. See also Acknowledgment of Compliance (LCDC staff report of July 11, 1983) accompanying In the Matter of Wasco County's Comprehensive Plan and Land Use Regulations, 83-CONT-192 (LCDC Sept. 7, 1983), at 4.
[32] The leading LUBA case on "quasi-urban" areas supports this conclusion:

"[C]ircumstances may exist * * * whereby it may be necessary to recognize quasi-urban areas outside an urban growth boundary. We believe the most reasonable approach which achieves the purpose of Goal 14 is to follow Goal 2's exception process when determining whether quasi-urban uses may be located outside [UGBs] on resource lands as defined by the Goals. That is, the county may recognize the existence of White City and its built-up lands. Any expansion beyond what is already built on resource land would be undertaken with the ["reasons" exception process]. * * *
"We believe this process will preserve what we perceive as an intent throughout the goals to limit expansion of urban uses outside the urban areas."
Medford v. Jackson Cty., supra, n. 19, 2 Or.LUBA at 391. Now that exceptions may be taken to Goal 14, the exception process to be followed in recognizing quasi-urban uses is the one for "built" and "committed" exceptions to that goal.
[33] We agree with LCDC that what is "urban" depends heavily on the context, but we have already decided that the existing uses in the county's exceptions areas have not been shown to be "quasi-urban." Part III.C.1, supra.
[34] The county says that in Halvorson v. Lincoln County, No. 84-099 (Or.LUBA July 19, 1985), a density of parcels greater than proposed here (41 lots on 25 acres) was found not to be urban. In that case, LUBA did not determine that such a density would not be urban but rather that the county had not shown that the area, which was in only 17 different ownerships and had only eight lots developed with residences, was already committed to urban use. The decision did not say the proposed density would not be urban; indeed, the context of the decision was an objection to the county's extension of a UGB, a virtual admission by the county that it considered the proposed density urban.
[35] The principal cases cited by the parties are Patzkowsky v. Klamath Cty, 8 Or.LUBA 64, 71 (1983) (requiring county to discuss whether subdivision into one-acre lots in area 14 miles from UGB and two miles from nearest unincorporated community would comply with Goal 14); 1000 Friends of Oregon v. Clackamas County, 3 Or.LUBA 316, 327, 330 (1981) (to designate one-, two- and five-acre residential zones without addressing their impact on UGBs violates Goal 14); Medford v. Jackson Cty, supra, n. 19, 2 Or.LUBA at 389-91 (describing as "quasi-urban" a 2,600-acre area between Medford and Eagle Point containing 4,300 residents and the largest concentration of industry in the county); Metropolitan Serv. Dist. v. Clackamas Cty, 2 Or.LUBA 300, 307 (1981) (holding that although 13 lots on 31 acres 1frac12; miles from UGB, and 12 lots on 28 acres 1frac12; mile from UGB, are not necessarily "`urban' as a matter of law," close proximity to UGB requires county to consider whether UGB "would be affected by the approval" of these subdivisions); In the Matter of Linn County's Comprehensive Plan and Land Use Regulations, 84-CONT-383 (LCDC Dec. 21, 1984, adopting staff report of Oct. 25, 1984), staff report at 33-34 (111-unit Planned Unit Development (PUD) on 117 acres requiring community sewer system violated Goal 14); In the Matter of Lane County's Rural Comprehensive Plan and Land Use Regulations, 84-ACK-201 (LCDC October 3, 1984, adopting staff report of June 29, 1984), staff report at 16, 50 (Cluster Subdivision on 500-acre parcel allowing 500 units on small lots with remainder in "common open space" would be an "urban" subdivision, not permitted in rural areas); Ager v. Klamath Cty, 3 LCDC 157, 161, 177-79 (1979) (PUD of 700 to 800 residences, single and multiple-family dwellings on lots of one acre or less, and ten-acre shopping area would be "urban" level of development); Umatilla & Hermiston v. Umatilla Cty., 2 LCDC 204, 218-19, 222-23 (1979) (1,100-resident mobile home subdivision outside cities' UGBs requiring "urban density services" such as water, sewers, fire protection, and schools violated Goal 14).
[36] This is the definition of "urban use" mentioned in passing by LUBA in Halvorson v. Lincoln County, No. 84-099 (Or.LUBA July 19, 1985), slip op at 8, but not yet applied in any case we have found.
[37] The principal cases are Ashland v. Jackson Cty, 2 Or.LUBA 378, 382 and n. 5 (1981) (designating area outside UGB for "Interchange Commercial" zone of strictly "tourist-oriented" businesses such as gas stations, motels, restaurants. and truck-stop facilities violated Goal 14); Conarow v. Coos County, 2 Or.LUBA 190, 193 (1981) (2,500 square-foot building including rural neighborhood grocery store did not violate Goal 14); Wright v. Marion County Board of Commissioners, 1 Or.LUBA 164, 170 (1980) (needs for non-farm, non-forest industrial uses must be satisfied from land included within UGB); Sandy v. Clackamas Cty., 3 LCDC 139, 145, 155-56 (1979) (90,000 square-foot shopping center including supermarket, furniture store, clothing stores, music and record store, motel, and office space, located three to four miles outside UGB, would be urban).
[38] We do not know whether this means that Vista Loop is actually served by the Gold Beach system at present, or merely that residents from the area could tap into the main at that point. In discussing other areas where public water is in use, the county tends to say that the area is "served" or "provided" with public water.
[39] Former OAR 660-04-025(3) and (4) ( repealed by LCDC 9-1983, effective Dec. 30, 1983) provided:

"(3) An assessment of whether land is built upon or irrevocably committed to uses not allowed by the applicable goal shall be based on findings of fact, supported by substantial evidence in the record of the local proceeding, that address the following:
"(a) Adjacent uses;
"(b) Public facilities and services (water and sewer lines, etc.);
"(c) Parcel size and ownership patterns;
"(d) Neighborhood and regional characteristics;
"(e) Natural boundaries; and
"(f) Other relevant factors.
"(4) A conclusion that land is built upon or irrevocably committed to uses not allowed by the applicable goal shall be based on one or more of the factors listed in section (3) of this rule. The conclusion shall be supported by a statement of reasons explaining why the facts found compel the conclusion that it is not possible to apply the goal to the particular situation or area."
[40] OAR 660-04-028(2)(c)(A) and (B), set forth in n. 29, supra.
[41] E.g., Mid-Squaw Valley, Squaw Valley-McKinnen Drive, North Bank/Edson Creek, and Pedro Gulch/Squaw Valley Junction.
[42] E.g., South Frankport (presence of "roads within this area"); Lower Squaw Valley (large parcel "can be considered committed because Squaw Valley Road borders this piece on two sides"); Canfield Bar ("This parcel is located between the other two parcels and has frontage on the county road. For these reasons this parcel can be considered committed.").
[43] Even if the Harbor Bench Farm District could only be implemented by including farm parcels in exceptions areas, that fact would not justify our disregarding the "impracticability" test. We note, moreover, that the "unique management concept" does not depend on the entire district being excepted from Goals 3 and 4; the county's maps show that the District contains several areas of land that are not within any exceptions area.
[44] That determination is required only for the exceptions areas in which 1000 Friends has claimed that land is actually being farmed: the areas listed in Record Exhibit 13.